### STATE

### v.

### Nelson BIDO.

### No. 2007–26–C.A.

Supreme Court of Rhode Island.

Jan. 7, 2008.

---

Aaron L. Weisman, Esq., Providence, for Plaintiff.

Janice M. Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

In May 2006, a jury convicted the defendant, Nelson Bido, of aiding and abetting the murder of Jorge Confessor and conspiracy to commit robbery. Mr. Confessor was shot in the back in the parking lct of Citizens Bank on Cranston Street in Providence on April 15, 1991. On appeal, Mr. Bido argues that the convictions must be reversed and either the indictment dismissed or he be given a new trial. Specifically, he contends the trial justice erred in four crucial respects by denying: (1) his *pro se* motion to dismiss for lack of a speedy trial; (2) his motion for a continuance to secure new counsel; (3) his motion for a continuance to investigate recently disclosed discovery; and (4) his motion to suppress a statement he gave to a New York City police detective. For the reasons set forth in this opinion, we affirm the judgment of conviction.

## I

### Facts and Procedural History

On April 15, 1991, Mr. Confessor, an employee of Mendes Department Store, collected weekend cash and check deposits from the department store and from its affiliated store, Mendes Gift Shop, and he proceeded to Citizens Bank on Cranston

Street to deposit the money. The cash and checks reportedly totaled $29,000. Mr. Confessor parked his car at the bank and headed toward the entrance carrying the deposits in a brown paper bag. As Mr. Confessor walked across the parking lot, a witness observed another car enter the parking lot from the bank's exit lane. An individual got out of the car from the back seat, approached Mr. Confessor, shot him, and took the brown paper bag. The witness observed two other people in the front seat of the getaway car, and managed to memorize the license plate number as the car drove away. Mr. Confessor was pronounced dead at the scene.

The witness reported the crime and the license plate number to the Providence police. The police traced the license plate to Mr. Bido; his listed residential address was 148 Althea Street, a half-mile from the scene of the crime. There the police learned that Mr. Bido had moved to a nearby address with his girlfriend, Rosalinda Colon. When the police arrived at defendant's new address, 58 Althea Street, Ms. Colon answered the door. Ms. Colon later agreed to provide a written statement, and she signed a consent form that allowed the police to search the premises.

Ms. Colon's written statement and her trial testimony provided details about Mr. Bido's involvement in the crime.[1] On April 14, 1991, one day before Mr. Confessor's murder, defendant and three other men met at 58 Althea Street and planned the robbery. The next morning defendant left the apartment driving his four-door burgundy Chevrolet. He returned to 58 Althea Street later that day, asked Ms. Co-

lon to pack up his things, and told her "I'm in trouble," "I did something wrong," and "I'm going to New York." Mr. Bido stayed in the apartment for about five minutes before leaving for New York City. As he rushed to leave, he told Ms. Colon to throw out a bag that he had left in the apartment. After defendant departed for New York, Ms. Colon put the bag in the basement, after which she discovered a gun inside it.

When the police searched 58 Althea Street, Ms. Colon directed them to the basement, where they seized the gun, Mr. Bido's passport, his address book, and other forms of identification. The police also recovered $1,700, which Ms. Colon surreptitiously had taken from defendant as he prepared to leave for New York. Later, the police confirmed that the bullet that killed Mr. Confessor was fired from the gun seized at 58 Althea Street.

The Providence police contacted their New York counterparts soon after the murder. On July 2, 1991, Det. Anthony Vazquez of the New York City police and his partner spotted an individual fitting Mr. Bido's description enter a vehicle with the same license plate and description as the car used in Mr. Confessor's murder. Detective Vazquez and other New York City police officers arrested Mr. Bido and placed him in Det. Vazquez's vehicle. While handcuffed in the back seat, defendant leaned forward and without provocation said, "I know what this is about. This is about Rhode Island." Detective Vazquez cautioned Mr. Bido not to make any more statements in the car.

---

1. Before trial, Ms. Colon signed an affidavit that said defendant was not in Rhode Island when the crime occurred. The affidavit alleged that a man named Giovanni borrowed Mr. Bido's car on the day of the murder and made incriminating statements to her. At trial, Ms. Colon disowned the affidavit and explained that she signed it because Mr. Bido threatened her. The state played a recorded conversation between Mr. Bido and Ms. Colon, in which Mr. Bido told her to "[b]e more afraid of me than the police"; he also told her not to come to trial, and not to talk to the prosecutor.

At the police station, Det. Vazquez placed Mr. Bido in an interrogation room and read him his *Miranda*[2] rights. According to Det. Vazquez, defendant said he understood his *Miranda* rights and agreed to speak freely. Mr. Bido told Det. Vazquez that on the day of the murder he loaned his car to a friend named Yovanny. Mr. Bido said he knew that Yovanny and two other males planned to rob a courier because Yovanny told him so when he borrowed the car. Mr. Bido said that he followed Yovanny to Citizens Bank in another car, but lost sight of him before hearing a gunshot. When he arrived home, he said, Ms. Colon told him that Yovanny had stopped by and left something downstairs for him in a bag. Detective Vazquez relayed the substance of defendant's statement to a Providence detective.

The case took an unexpected turn after Mr. Bido's arrest. He remained in jail in New York for about four months. Ms. Colon and Mr. Bido were married during that time, apparently so that Ms. Colon could not be used as a witness against him. The Providence police went to New York to extradite defendant, but for reasons that are not disclosed in the record, the grand jury proceedings were not completed within the required period and Mr. Bido was released from custody.

On July 2, 1992, the State of Rhode Island charged defendant with three crimes: conspiracy to commit robbery, in violation of G.L.1956 § 11-1-6 and G.L. 1956 § 11-39-1, as amended by P.L.1980, ch. 94, § 1; aiding and abetting the robbery, in violation of § 11-1-3 and § 11-39-1; and aiding and abetting the murder of Mr. Confessor, in violation of § 11-1-3 and G.L.1956 § 11-23-1, as amended by P.L. 1990, ch. 284, § 4.

Thirteen years later, in 2005, defendant was arrested and brought back to Rhode Island. The trial occurred in May 2006. The prosecution called ten witnesses, including Mr. Bido's now-estranged wife, Ms. Colon, several active or retired Providence police officers, a retired New York City police detective, an employee at the gift shop who saw defendant on the day of the crime, and a witness who saw the shooting at Citizens Bank. The defense did not call any witnesses. At the close of evidence, the state dismissed the charge of aiding and abetting a robbery, and Mr. Bido moved for judgment of acquittal, which the trial justice denied.

The case went to the jury, and defendant was convicted of conspiracy to commit robbery and aiding and abetting the murder of Mr. Confessor. On July 5, 2006, the trial justice heard and denied defendant's motion for a new trial. On September 8, 2006, the trial justice sentenced Mr. Bido to life imprisonment for the murder and to a concurrent term of ten years for conspiracy to commit robbery.

We address Mr. Bido's four assignments of error sequentially. Additional facts will be supplied as needed.

## II

## Motion to Dismiss for Lack of a Speedy Trial

Mr. Bido alleges that the trial justice improperly denied his motion to dismiss for lack of a speedy trial. On May 22, 2006, the day on which the trial was scheduled to begin, defendant appeared before the trial justice while represented by counsel. The following colloquy occurred between Mr. Bido and the trial justice, part of which was aided by an interpreter:

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"THE DEFENDANT: Before we begin, I would like to tell something to the Judge.

"THE COURT: Well, now, before you say anything at all, sir, let me caution you that anything that you say could be used against you at a trial in this matter. You're represented by counsel at this point, and I would suggest that if you wish to have something directed to me, that you have your attorney do it.

" * * *

"THE DEFENDANT: I wanted you, your Honor, because I want to find another lawyer or somebody, because how I go to start with—

"THE COURT: Let me ask you this. Would you object to [your attorney] telling me what your desires are?

"THE DEFENDANT: Yeah, I do.

" * * *

"THE [defendant through] INTERPRETER: I don't want him to represent me in the State because too many things, we have communications, I don't want him to send me to trial like that because, you know, today he told me he got one offer to me, the first time I hear about an offer.

" * * *

"[THE defendant through INTERPRETER:] I don't feel really comfortable with him representing me. I been in prison three times for the same case already. I've never rejected coming here at any point. I don't know why they release me. I lived 15 years in the same street, the same house with the same lady; filing security tax, the same name. Why didn't they arrest me before I went to renew my green card at immigration before? And right there they arrested me and told me that the case was still open. And then they arrested me and then they released me back there. And then I kept coming back to court during those three months, and three months later they came back and arrested me again. And I been here for eight and a half months or so. The first time, I was five and a half months there waiting for them to come. And the second time they arrested me, I was there in prison for four days. So, I don't know what is happening right now. I have never been that type of person that they accuse me of."

Before this Court, Mr. Bido argues that his statement to the trial justice can and should be characterized as a motion to dismiss for lack of a speedy trial and that the trial justice erred by denying such motion. Mr. Bido contends that the information he provided to the trial justice, in particular the fact that he was arrested and released three times in New York and the fact that he lived at the same address under his lawful name and filed tax returns throughout the fifteen years before trial, effectively constituted a speedy-trial motion. In response, the state argues that defendant made a request for a continuance to seek new counsel, not a motion to dismiss for lack of a speedy trial. The state contends that Mr. Bido made his statements about his whereabouts in New York quite plainly in the context of his explanation about why he wanted a new lawyer.

As a general matter, this Court reviews *de novo* a trial justice's ultimate determination that a defendant's constitutional right to a speedy trial has not been violated. *State v. Perez*, 882 A.2d 574, 590–91 (R.I.2005). However, as we have stated many times, this Court's "raise-or-waive" rule precludes our consideration of an issue that has not been raised and articulated at trial. *E.g. State v. Brown*, 915 A.2d 1279, 1282 (R.I.2007); *State v. Ibrahim*, 862 A.2d 787, 795 (R.I.2004). It

is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court. *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 640 A.2d 950, 959 (R.I. 1994). This directive will not be disturbed unless "basic constitutional rights are concerned." *State v. Gomez*, 848 A.2d 221, 237 (R.I.2004) (quoting *State v. Donato*, 592 A.2d 140, 141 (R.I.1991)). In those cases, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *State v. Breen*, 767 A.2d 50, 57 (R.I.2001) (citing *State v. Gomes*, 690 A.2d 310, 319 (R.I.1997)).

■ "[A] motion upon which a trial justice has not ruled presents no question for review by this Court." *State v. Abreu*, 899 A.2d 473, 476 (R.I.2006). Our cases indicate that the moving party at the trial court level must articulate the motion in an understandable manner for the trial justice. *See Smiler v. Napolitano*, 911 A.2d 1035, 1041 (R.I.2006) (finding that an argument was waived when "[t]he record is clear that even the motion justice understood that the only issue before him was the constitutionality of [a statute]"); *State v. Hazard*, 797 A.2d 448, 458–59 (R.I.2002) (ruling that the party properly preserved an objection when the trial justice "clearly understood the basis" of the challenge to the testimony of a particular witness). This Court will not fault a trial justice for failing "to rule upon a question that was not presented to him [or her] in a rational and recognizable posture." *State v. Fogarty*, 433 A.2d 972, 974 (R.I.1981).

A necessary implication of defendant's assignment of error in this case is that the trial justice erred by not recognizing his remarks as a motion to dismiss for lack of a speedy trial. Much is expected of our trial justices; we will not, however, fault them for a failure of clairvoyance. It is clear from the transcript that the trial justice understood Mr. Bido's remarks as only a request for a continuance so that he could obtain new counsel. Yet after the trial justice denied the motion for a continuance, neither Mr. Bido nor his counsel attempted to articulate or clarify the purported motion to dismiss for lack of a speedy trial. Moreover, immediately after Mr. Bido concluded his statement and before ruling on it, the trial justice asked, "Is there anything either of the attorneys want to add?" To that question defendant's counsel succinctly responded, "No, Judge."

■ Nor did Mr. Bido or his counsel ever request an evidentiary hearing. A defendant's own representations, not made under oath, does not provide a sufficient factual predicate for a trial justice to dismiss for lack of a speedy trial, particularly when, as here, it was not clear to either the trial justice or the prosecution that such a motion was being advanced. If defendant intended to make a motion to dismiss for lack of a speedy trial, he did not put forth his argument in a rational and recognizable posture to the trial justice. Mr. Bido's remarks about the delay in his prosecution all are couched in his assertion that "I don't feel really comfortable with [the court appointed attorney] representing me." We will not ascribe error to the trial justice for failing to divine a lack of a speedy trial motion from Mr. Bido's remarks to the court.

■ The exception to the "raise-or-waive" rule is of no assistance to defendant. A motion to dismiss for lack of a speedy trial is not "an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Breen*, 767 A.2d at 57 (citing *Gomes*, 690

A.2d at 319). The right to a speedy trial to those accused of committing a criminal offense is guaranteed by both the federal and state constitutions. U.S. Const. Amend. VI; R.I. Const. art. 1, sec. 10. It is not a novel rule of law. We conclude therefore that the issue has not been preserved for our review.

## III

### Motion for Continuance to Secure Other Counsel

■ On the eve of trial, Mr. Bido did make, however, an oral motion to secure new counsel. During the course of Mr. Bido's remarks, the trial justice recommended to him that he let his lawyer speak for him, and defendant agreed. Mr. Bido's counsel had been involved with the case at least since August 26, 2005, eight months before trial. Defense counsel informed the trial justice that Mr. Bido wanted a postponement to find a new lawyer. Mr. Bido's counsel represented to the court that "as far as my not representing Mr. Bido or Mr. Bido not wanting me to represent him, this is the first I heard of it today. This is the date of trial. I just heard about this in the cell block a couple of hours ago." The attorney also told the trial justice that he had informed defendant about the state's plea offer on several occasions. Defense counsel explained that "I learned of Mr. Bido's not wanting me to represent him today when I informed him that a critical witness for the State, Mr. Bido's wife, was, in fact, going to be coming in to testify * * *." The attorney represented to the court that he was comfortable going forward with the case and with his representation of Mr. Bido.

The state objected to defendant's motion for a continuance to secure other counsel. The prosecutor noted that the case had been pending for a number of years. The state explained that it had flown in witnesses from two other states, in addition to arranging Ms. Colon's travel plans, and they all were expected to arrive either that day or the next day. The state represented to the trial justice that it was ready to go forward, and it objected to Mr. Bido's motion for a continuance because "it's a date certain and because of the fact that we have all these witnesses who are already here."

The trial justice denied defendant's motion for a continuance. The court recognized that its function was to balance the interests of the defendant and the state. The trial justice first reviewed the interests of the state. The court noted that the state had "expended considerable funds to get these witnesses here in Rhode Island" for trial, and that the witnesses might not be able to return at a later date. The trial justice explained that those considerations, in addition to the fact that fifteen years had passed since the crime occurred, emphasized the need for finality. The trial justice also reviewed Mr. Bido's interests. The court found that there was no indication that another attorney had been retained and was ready to step in and start the trial. The trial justice said that there was "just some speculation about talking about wanting to get someone else," and he explained that he believed that defense counsel was fully capable of representing defendant effectively. The court determined that the need for finality outweighed defendant's desire to seek other counsel, and he denied the request for a continuance.

Before this Court, Mr. Bido relies upon the provisions in the state and federal constitutions that guarantee the assistance of counsel. U.S. Const. Amend. VI; R.I. Const. art. 1, sec. 10. Mr. Bido acknowledges that the right to secure counsel of one's choice is not an unqualified one, but argues that in this case his interest is

greater than the public's right to the efficient and effective administration of justice. Mr. Bido points out that the communication between himself and his attorney broke down on the eve of trial and that nothing indicates he was embarking on a deliberate tactic to delay the proceedings. To the contrary, defendant reasons that he was not in the habit of dismissing his attorneys; and he points out that he presented the court with specific reasons why he wanted alternate counsel, namely his dissatisfaction with the lack of communication about plea offers and his speedy-trial concerns.

■■■■ "It is well settled that the decision whether to grant a defendant's request for a continuance to secure alternative counsel lies within the sound discretion of the trial justice." *State v. Snell*, 892 A.2d 108, 120 (R.I.2006); *State v. Bleau*, 668 A.2d 642, 645 (R.I. 1995). "In exercising that discretion, 'the trial justice must weigh the interest of the defendant in securing counsel of his choice against the interest of the public in an efficient and effective judicial system.'" *Snell*, 892 A.2d at 120 (quoting *State v. Ashness*, 461 A.2d 659, 663–64 (R.I.1983)). "Whether the trial justice's denial was so arbitrary as to constitute a violation of due process 'depends upon the particular circumstances of each case and the reason asserted for the request.'" *Id.* (quoting *Ashness*, 461 A.2d at 664). We further elaborated as follows in *Snell*:

"Some of the factors to be weighed in the balance include the promptness of the continuance motion and the length of time requested; the age and intricacy of the case; the inconvenience to the parties, witnesses, jurors, counsel, and the court; whether the request appears to be legitimate or merely contrived foot dragging; whether the defendant con-

tributed to the circumstances giving rise to the request; whether the defendant in fact has other competent and prepared trial counsel ready to pinch-hit; whether there are multiple codefendants, making calendar control more difficult than usual; and any other relevant factor made manifest by the record." *Id.* (quoting *State v. Moran*, 699 A.2d 20, 26 (R.I.1997)).

■■■■ We are mindful that "[j]udges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for delay." *Snell*, 892 A.2d at 120 (quoting *State v. Monteiro*, 108 R.I. 569, 576, 277 A.2d 739, 743 (1971)). A defendant's "right to choose his own counsel cannot be manipulated to delay proceedings or hamper the prosecution." *Snell*, 892 A.2d at 120 (quoting *United States v. Panzardi Alvarez*, 816 F.2d 813, 816 (1st Cir.1987)). We have stated that "to work a delay by a last minute discharge of counsel, there must exist exceptional circumstances * * *." *Id.* (quoting *Monteiro*, 108 R.I. at 575, 277 A.2d at 742). The United States Court of Appeals for the First Circuit similarly has held that "[w]hen a defendant attempts to substitute counsel at the eleventh hour or in mid-trial, he must show good cause such as a conflict of interest, a breakdown in communication or an irreconcilable dispute with his attorney." *Id.* (quoting *Panzardi Alvarez*, 816 F.2d at 816).

We are satisfied that the trial justice did not abuse his discretion in denying Mr. Bido's motion for a continuance to secure other counsel. Applying the above-listed factors from *Snell*, we are persuaded that the trial justice did not act arbitrarily in this particular case. Mr. Bido had no private counsel prepared to proceed on his behalf when he made the motion for a continuance. *See Snell*, 892 A.2d at 119; *State v. Austin*, 642 A.2d 673, 676 (R.I.

1994). Mr. Bido had been represented by the public defender for at least eight months, but he waited until the very last minute before trial to make the motion. *See State v. Moran,* 699 A.2d 20, 26 (R.I. 1997); *State v. Kennedy,* 586 A.2d 1089, 1091 (R.I.1991). Mr. Bido had ample time after the public defender was appointed to secure other counsel and make the court aware of his dissatisfaction. *See Ashness,* 461 A.2d at 664. The case had been reached for trial, and the state had arranged for transportation for several out-of-state witnesses who were prepared to testify. *See id.; see also State v. Sampson,* 884 A.2d 399, 404 (R.I.2005); *Bleau,* 668 A.2d at 646. Further, his requested delay appeared to be a stratagem to avoid the day of reckoning rather than for legitimate reasons. *See Moran,* 699 A.2d at 26. His defense lawyer represented to the court that he told Mr. Bido about the state's plea offer on several occasions and that Mr. Bido expressed dissatisfaction with his representation only after he heard that Ms. Colon would be arriving shortly to testify against him.

These circumstances, taken together, demonstrate that the interest of the public in an efficient and effective judicial system outweighed Mr. Bido's purported interest in securing counsel of his choice. *See Snell,* 892 A.2d at 120–21; *Ashness,* 461 A.2d at 663–64. No exceptional circumstances were present to constitute good cause for Mr. Bido to discharge his lawyer. In sum, the trial justice did not abuse his discretion in denying defendant's attempt to secure new counsel.

## IV

### Motion for a Continuance Because of Last Minute Discovery

█ The defendant next argues that the trial justice erred by denying his motion for a two-week continuance to investigate information contained in a memorandum that the state did not disclose to him until the morning of trial. The prosecutor represented to the trial justice that just before the trial was scheduled to start he reviewed his files and found an inter-police memorandum between two police officers. The prosecutor did not know whether defense counsel had a copy of the document, so he provided one to the defense. The substance of the memorandum, dated April 20, 1991, detailed information from a relative of the deceased. The memorandum indicated that the relative "had recieved [*sic*] information 3rd hand concerning the identities of the murderers." The relative's source wished to remain anonymous, but reportedly was the mother of a girlfriend of one of the perpetrators. The source relayed to Mr. Confessor's relative the names of other people involved in the crime. According to the source, two other people involved in the murder had paid off a tab at a restaurant, and one had bought a house full of furniture. The source also said that Mr. Bido and another perpetrator were "supposedly out of town possibly headed to the [Dominican Republic]." The relative that spoke with the anonymous source also followed one of the other suspects around town to a street address and copied his license plate number for the police.

Mr. Bido's defense counsel represented to the trial justice that he found out about the police memorandum for the first time when the prosecutor handed it to him earlier that day. Defense counsel told the court that his investigative staff had located the person who provided the statement to the police earlier that afternoon, but that the person would not be able to talk until later that evening. Counsel explained that he was not sure what information he would glean from speaking with that person, and he said that he wanted to

locate one of the other perpetrators named in the memorandum. Defense counsel requested "a couple of weeks" to investigate the leads.

The trial justice declined to continue the case. The court noted that jury impanelment would not begin until the next morning and that, since the defense had located the person who provided the statement to the police, there was an opportunity to adequately respond to the memorandum and begin an investigation. The court told defense counsel that "since we're not going to start today, you should have an opportunity to follow up * * * this evening and see where that leads, and then we'll go from there. But, at this time the Court will deny the request for any further continuance." The trial justice also noted that there was no indication or allegation that the memorandum was hidden from the defense. Defense counsel did not renew the request for a continuance on the following day.

Before this Court, Mr. Bido argues that the trial justice erred by declining to grant a continuance to investigate leads prompted by the memorandum. Because the memorandum contained information about the identities and locations of two of the perpetrators, defendant contends that the failure to grant the continuance deprived him of the opportunity to locate two men who could have exonerated him. Mr. Bido also asserts that the obvious significance of the document was such that the state should have known to turn it over promptly to the defense. Mr. Bido alleges that the prejudice from the late disclosure was "enormous," and that it could have been rectified by the requested two-week continuance.

■ We first observe, contrary to defendant's suggestion in his brief, that the state's eleventh-hour disclosure of the police memorandum did not constitute a violation of Rule 16 of the Superior Court Rules of Criminal Procedure. Although defendant now says he was prejudiced by the late discovery, he does not specify how Rule 16 was violated. We note that Rule 16(a)(8) requires the state to disclose all written or recorded statements of people whom the state expects to call as witnesses. In this case, neither the police officer who authored the memorandum nor the officer who received it were called as witnesses. Significantly, Mr. Bido never alleged a Rule 16 violation to the trial justice. In his reply brief, defendant suggests for the first time that, regardless of whether or not the memorandum was discoverable under Rule 16, the state was required to disclose the document under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. As defendant acknowledges, however, because the memorandum was, in fact, disclosed, the only issue on appeal is whether the trial justice afforded him sufficient opportunity to deal with the information before the trial began. We review his ruling, therefore, under an abuse-of-discretion standard. *See Bergeron v. Roszkowski*, 866 A.2d 1230, 1235 (R.I.2005).

We are satisfied the trial justice appropriately weighed both defendant's and the state's interests in considering the request for a continuance, and we conclude that his ruling was reasonable under the circumstances. Noting that investigators from the Public Defender's office already had been able to locate the informant named in the memorandum and that defendant should have an opportunity to follow up on that lead, the trial justice told counsel to contact the informant that evening "and see where that leads, and then we'll go from there. But, at this time the Court will deny the request for any further continuance." Clearly the trial justice did not foreclose defendant from revisiting the is-

sue depending on what transpired with the investigation that evening. Mr. Bido, however, never raised the issue again. We are of the opinion that the trial justice did not abuse his discretion in denying the defense's request for a continuance.

## V

### Motion to Suppress the Statement to Detective Vazquez

■ Mr. Bido's final argument on appeal alleges that the trial justice erred in denying his motion to suppress the statement he made to Det. Vazquez on July 2, 1991. Mr. Bido moved to suppress the statement before trial, and the court held a voir dire midtrial when Det. Vazquez arrived to testify. Detective Vazquez retired from the New York City Police Department in 2000. During the voir dire, Det. Vazquez testified that he arrested defendant in July 1991. Detective Vazquez explained that Mr. Bido began talking while they were driving back to the police station in a police car after the arrest. Mr. Bido said, "I know what this is about. This is about Rhode Island. I'll tell you whatever you want to know. We'll talk about that." Detective Vazquez responded, "Let's not talk about it now. I'm not in a position to write. I'm driving. We have time. We'll get back. That's what we're going to talk about and we'll do it in a couple of minutes."

When they arrived at the police station, Det. Vazquez placed defendant in an interrogation room. Detective Vazquez testified that he read Mr. Bido his *Miranda* warnings before they spoke about "the incident in Rhode Island." Detective Vazquez, who is fluent in Spanish, used a printed *Miranda* warning interrogation card and read defendant the *Miranda* warnings in Spanish. Detective Vazquez testified that he read the *Miranda* warnings verbatim from the interrogation card

and that he read each *Miranda* question individually, after which he said to defendant, "Do you understand?" or "Answer yes or no to each and every question." According to Det. Vazquez, Mr. Bido answered "yes" after each individual *Miranda* warning. Detective Vazquez also directed defendant to write "yes or no" on the interrogation card after he read each warning, after which Mr. Bido wrote "yes" for each question in Spanish. Detective Vazquez described defendant as "calm" during the interrogation, and he testified that defendant never asked for an attorney. After Mr. Bido waived his *Miranda* rights, Det. Vazquez said, "You want to talk to me about the Rhode Island case? This is about the Rhode Island case. Tell me what you wanted to tell me back at the scene." Mr. Bido then began to speak to Det. Vazquez.

Detective Vazquez took notes relating to defendant's statement, but he was unable to find them before testifying at Mr. Bido's trial. Detective Vazquez explained that he searched for his notes for five hours at his old New York City homicide office on the Monday before trial, but that his search was unsuccessful. Detective Vazquez theorized that the notes might have been lost when his office moved in the early 1990s and that, since Mr. Bido's crime was committed in Rhode Island, not New York, it probably did not have a New York case number. He also was unable to find the *Miranda* interrogation form he used, which contained defendant's signed responses, because he "turn[ed] that over to the detectives in Rhode Island. I'm almost sure of it." In any event, Det. Vazquez testified that he "vividly * * * remember[ed] this particular case," because "it was the first and only contact I had in my 20–year career with anything to do with Rhode Island." During the voir dire, Det. Vazquez testified that he re-

freshed his recollection of Mr. Bido's statements by reviewing a summary by Det. J.J. Corley of the Providence police, which was made when Det. Vazquez relayed the substance of Mr. Bido's statements to Det. Corley on the evening after the arrest.

At the conclusion of the voir dire, the trial justice ruled that defendant gave a voluntary statement during his interrogation in New York. The court found that the arrest was an orderly stop and that defendant showed an early indication that he wanted to speak, even before he was advised of his rights, when he spontaneously said in the police car that "I know what this is about. This is about Rhode Island." The trial justice found that Det. Vazquez read defendant the *Miranda* rights in Spanish, his native language, and that defendant understood each right, after which he began to talk. The trial justice also acknowledged that Mr. Bido did not request an attorney and that he remained calm at all times and appeared cooperative. The court further found that Det. Vazquez could not find his notes because it was a Rhode Island case. However, the trial justice said that the notes from the Providence police were adequate to refresh Det. Vazquez's recollection, and that he had a vivid memory of the arrest because of its uniqueness in his professional career. The court concluded that Mr. Bido's statement "was voluntarily made and the State has established this by clear and convincing evidence."

Before this Court, Mr. Bido argues that the state failed to show, by clear and convincing evidence, that he knowingly and intelligently waived his constitutional rights and made a voluntary statement to Det. Vazquez. Mr. Bido alleges that the state did not produce a signed *Miranda* rights form or a signed statement and that the state provided no explanation for why these documents were not produced by the Providence police. Mr. Bido also argues that Det. Vazquez had no independent memory of the substance of his alleged statement and that he was able to testify only after reading Providence Det. Corley's report about the encounter. Finally, defendant claims that there was no evidence to suggest that he had previous experience with the criminal justice system or that he possessed sufficient intellectual capabilities to understand his rights and make a valid decision to waive them.

Both the Rhode Island and the United States Constitutions bar the use of a defendant's involuntary statements in a criminal trial. *State v. Humphrey*, 715 A.2d 1265, 1274 (R.I.1998). When deciding a motion to suppress, a trial justice can admit a confession or a statement against a defendant only "if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona*." *State v. Dumas*, 750 A.2d 420, 423 (R.I.2000) (quoting *State v. Nardolillo*, 698 A.2d 195, 200 (R.I.1997)).

On appeal, this Court performs a two-step analysis to review a trial justice's decision on a motion to suppress a statement that is alleged to be involuntary. *Perez*, 882 A.2d at 588. "The first step is to 'review the trial justice's findings regarding the historical facts relevant to the voluntariness of the challenged confession.'" *Id.* (quoting *Humphrey*, 715 A.2d at 1273). "This Court will not overturn a trial justice's findings of historical fact relevant to the voluntariness of a confession unless such findings are clearly erroneous." *Humphrey*, 715 A.2d at 1273 (citing *State v. Bailey*, 677 A.2d 407, 410 (R.I. 1996)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite

and firm conviction that a mistake has been committed." *Perez,* 882 A.2d at 588 (quoting *State v. LaRosa,* 112 R.I. 571, 576, 313 A.2d 375, 377 (1974)). We are mindful that the trier of fact, which in this case was the trial justice, is in the best position to assess the relative credibility of witnesses. *See Humphrey,* 715 A.2d at 1273.

The second step of the analysis, assuming we accept the trial justice's findings of historical fact, requires this Court to apply those historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement. *See Perez,* 882 A.2d at 588. "A defendant's statement is voluntary when it is 'the product of his free and rational choice.'" *Humphrey,* 715 A.2d at 1274 (quoting *State v. Amado,* 424 A.2d 1057, 1062 (R.I.1981)). "A statement is involuntary if it is extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." *Humphrey,* 715 A.2d at 1274 (citing *State v. Griffith,* 612 A.2d 21, 25 (R.I.1992)). In deciding whether a statement is voluntary, this Court considers "the totality of the circumstances surrounding the challenged statement." *State v. Ramsey,* 844 A.2d 715, 720 (R.I.2004) (quoting *State v. Carter,* 744 A.2d 839, 845 (R.I.2000)). "The factors this Court may consider are the background, experience and conduct of the accused, as well as the level of a suspect's educational attainments." *Ramsey,* 844 A.2d at 720.

After carefully reviewing the record and keeping in mind that this Court gives deference to the trial justice's findings of historical fact, we cannot say that the trial justice's findings clearly were erroneous. Detective Vazquez was the only witness during the voir dire. Later in the trial proceeding, the trial justice remarked, "if

there ever were to be a model to use for police officers * * * one could look to retired Detective Vazquez as an example of how it's supposed to be done." *See Humphrey,* 715 A.2d at 1273 (upholding a trial justice's findings of historical fact that "seem[ed] firmly grounded on the credible and consistent testimony" of police officers "involved in the capture, arrest, and interrogation of the defendant"). The trial justice was in the best position to assess Det. Vazquez's credibility, and defendant put forth no evidence that contradicted Det. Vazquez's account of the circumstances that preceded defendant's statement. Although we are troubled by the state's inability to produce defendant's signed *Miranda* form, we are not left "with the definite and firm conviction that a mistake has been committed." *Perez,* 882 A.2d at 588 (quoting *LaRosa,* 112 R.I. at 576, 313 A.2d at 377). Accordingly, we accept the trial justice's findings of historical fact and proceed to review his determination of the voluntariness of Mr. Bido's statement *de novo.*

Considering the totality of the circumstances, and applying the findings of historical fact, we conclude that the defendant's statement was voluntary. He was properly informed of his *Miranda* rights in his native language, and he signed a waiver form that indicated each right was waived. *See Ramsey,* 844 A.2d at 720; *Humphrey,* 715 A.2d at 1274. There was no evidence that Mr. Bido was subjected to coercion or that he was intimidated in any way. *See Ramsey,* 844 A.2d at 720. To the contrary, the defendant appeared calm during the interview, and he spoke spontaneously even before Det. Vazquez administered the *Miranda* warnings. Detective Vazquez even went so far as to warn the defendant not to speak until they arrived at the police station. Further, during the suppression hearing, Mr. Bido put forth no

evidence that would have allowed the trial justice to make findings of historical fact about his background, experience, or educational attainment that might have tipped the totality of the circumstances in his favor. In sum, we agree with the trial justice that the defendant's statement was voluntary and was not the product of his overborne free will.

## VI

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of conviction and remand the papers in the case to the Superior Court.