April 29, 2019

**Supreme Court**

No. 2017-376-C.A.
(P1/14-1484C)

State                     :

v.                  :

Thomas Sanchez.        :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2017-376-C.A.
(P1/14-1484C)
(concurrence and dissent
 begins on page 15)

State      :

v.       :

Thomas Sanchez.   :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**  The defendant, Thomas Sanchez, seeks review of a judgment of conviction after a jury found him guilty of two counts of first degree robbery and one count of conspiracy to commit robbery.  Sanchez raises a sole issue before this Court—whether or not the admission of an out-of-court statement made by Maria Rojas, an alleged coconspirator who did not appear at Sanchez's trial, deprived him of his right to confront the witnesses against him, in violation of the Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution.  After thoroughly reviewing the record and after carefully considering the arguments of the parties, we affirm the judgment of conviction.

**I**

**Facts and Travel**

It has been said that nothing good happens after midnight.  The facts before us in connection with this case provide some support for that adage.  One night in February 2014, four friends—Leonardo Sanchez, Miguel Sanchez, Yonathan Melendez, and Joan Mustafa—spent the evening and early morning enjoying the nightlife of downtown Providence while partying at a

local nightclub.[1]  When the establishment closed at 3 a.m., the revelers visited a 7-Eleven and ordered some pizza.  While they were eating, Christopher Xavier approached Leonardo, claiming that he knew him.  Although he believed that Xavier might have been an occasional customer at his father's store, Leonardo told Xavier that he did not recognize him.

Meanwhile, Melendez had become engaged in a conversation with two women who had entered the store with Xavier.  One of the women was Maria Rojas, who invited the group to an "after party."  After some cajoling, Melendez persuaded his compatriots to accompany the women to the party.  A third woman joined the group and together, the four young men and three women squeezed into Leonardo's car as Maria directed them to her home, which was located on a dead end street in Pawtucket.

Upon arriving, the group got out of the car and descended into a "make-shift" basement apartment.  The "after party" the young men found there did not meet their expectations, and they found it to be sorely lacking in the expected festive accoutrements.  When he later testified at trial, Melendez said that the men remarked at the time, "Ah, there's no alcohol.  There's no music.  There's no party. What's going on?"  Both Melendez and Leonardo testified that the apartment was brightly illuminated, like "[a] normal apartment[,]" and that they could see clearly.   That said, the friends observed that the apartment was in a state of disarray and that a young man and a woman, later identified as Julian Diaz and his girlfriend, were sleeping in the living room.[2]  The friends had been in the basement apartment for about ten to fifteen minutes when they were joined by three new arrivals—Christopher Xavier, Josue Laboy, and defendant Thomas Sanchez.

---

[1] To avoid confusion, Leonardo and Miguel, who share their last name with defendant, will henceforth be referred to by their first names.  No disrespect is intended.

[2] Julian Diaz later testified that Maria Rojas's two young children were sleeping elsewhere in the apartment.

Leonardo testified that, after Maria asked defendant why he had arrived so late, defendant replied, "Oh, I'm late because I went home to get this," as he brandished what Leonardo believed to be a handgun that defendant had removed from his waistband. Also, Melendez later claimed at trial that, at some point soon after defendant and the other men arrived, Melendez excused himself to use the bathroom. He was soon joined by defendant, who offered to allow Melendez to "have sex with this girl" if Melendez were to pay him. According to Melendez, he rejected that offer and decided that it was time to leave. A few minutes later, Melendez and Miguel made their exit from the apartment.

Leonardo testified that, seeing his friends leave, he turned to say goodbye to the remaining partyers. Suddenly, defendant grabbed him from behind and held the handgun to his head. At the same time, Leonardo testified, Xavier held two knives to his abdomen. Leonardo testified that defendant then told him, "Run your pocket." Mustafa, who was huddled in the corner of the room, urged Leonardo to "give everything away. Give everything away." Leonardo did not heed that advice, and instead fought with defendant, lunging for the gun. Although he put up a valiant effort, in the end, Leonardo was subdued after defendant slammed the weapon into Leonardo's face three times.

Leonardo testified at trial that his face was so bloody that he "couldn't see nothing." He claimed that someone picked him up from the floor and that one of the women told him to remove his ring. With some effort he managed to remove the ring from his finger, and he "gave it to one of the girls." Someone, Leonardo was not sure who, relieved him of his wallet, cell phone, and $150 in cash. After Leonardo's pockets were unburdened, Maria helped him into the bathroom so that he could wash himself.

Melendez testified that, while the scene in the basement was playing out, he and Miguel

were waiting outside by the car. Melendez testified that one of the women came outside and told them that Mustafa and Leonardo wanted them to rejoin the party and that the woman insisted that everyone was having fun. Despite having reservations, Melendez said that he eventually decided to return to the party, but that Miguel remained outside.

Leonardo and Melendez each testified that defendant accosted Melendez as soon as he reentered the apartment; according to Melendez, defendant positioned himself behind Melendez while he held what Melendez believed to be a handgun while another man held a knife to Melendez's throat. Melendez said that, although defendant was behind him, he was able to see defendant's face during the encounter. Melendez further testified that someone told him, "Run your shit[,]" and Mustafa, who was sitting in a chair nearby, urged him, "Look what they did to Leonardo just do what they say." Melendez averred that, unlike Leonardo, he acted on Mustafa's advice, and he was soon separated from his jewelry, personal phone, work phone, roughly $800 in cash, and his "good luck charm," a $2 bill. Melendez testified that defendant also demanded that he hand over his sweater. According to Melendez, defendant removed his own shirt, which had been soiled by Leonardo's blood, and donned Melendez's sweater.

Melendez, Leonardo, and Mustafa were then allowed to leave, but Leonardo and Melendez each testified that their assailants were taunting them and bragging about having their belongings, and that one of their assailants—Leonardo testified that it was the man holding the knives—explained that he was aware of where the victims lived and that he threatened to hurt them or their families if they called the police. Before they left, Melendez asked defendant to return his sweater—he claimed it was a Christmas gift from his sister—and his work phone, and defendant complied with those requests. Despite the assailants' threats, Melendez called the police with his newly returned phone as Leonardo, Mustafa, and Melendez were leaving the

- 4 -

apartment. The men got into Leonardo's car and drove to a Dunkin' Donuts about a block away, where they reconnected with Miguel and waited for the police.

When police officers arrived at the scene, they stopped a vehicle as it was leaving the premises. Inside that vehicle were Julian Diaz, Josue Laboy, Christopher Xavier, Maria Rojas, two other women, and Maria's two young children. The defendant, who had been seated in the front passenger seat, already had left the vehicle and fled. The officers followed tracks in the snow through several residential lots and soon discovered defendant a few streets away from Maria's apartment, hiding under a deck. Police searched defendant and discovered that he was in possession of $737 in cash, two earrings, and a cell phone. A search of the suspects' car revealed a black BB gun on the floor behind the passenger seat and a magazine for the BB gun in the front passenger door compartment.

Police arrested defendant, Rojas, Diaz, Xavier, and Laboy, and, on May 15, 2014, all five were charged by indictment with three counts of robbery and one count of conspiracy to commit robbery.[3] Trial testimony revealed that Leonardo and Melendez both identified defendant from a photographic array of twelve pictures, both claiming that defendant was the man who had wielded what they believed was a firearm during the robbery. Diaz and Xavier each pled nolo contendere to the charges brought against them. Subsequently, at trial, both Diaz and Xavier acknowledged that, during the course of their plea colloquies, each had admitted to helping Sanchez commit the robberies. Xavier agreed during his trial testimony that he had answered "yes" during his plea colloquy when asked if defendant had held a gun to one of the victims.[4]

---

[3] The third count of robbery against defendant was dismissed prior to the conclusion of his trial. The charges against Laboy were dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure after he signed an affidavit detailing the events of the party-cum-robbery.
[4] Although the photographic array and plea colloquies were not transmitted to this Court as part of the record below, defendant did not dispute at trial that it was his picture that had been

At defendant's trial, Laboy, Diaz, Xavier, and defendant all testified about the events of that night. Laboy's testimony was largely corroborative of that provided by Leonardo and Melendez. Significantly, Laboy testified that, about twenty minutes after the four friends had arrived at the party, defendant struck Leonardo with a handgun and told him, "Run your pocket. Give me your money[,]" while another man wielded two knives. Laboy further testified that defendant later robbed the second victim (Melendez) while using the "same gun." The stories told by defendant, Diaz, and Xavier, however, were considerably inconsistent. Significant to this appeal, however, Maria Rojas absconded and a warrant was issued for her arrest. By the time of defendant's trial, she had not been apprehended and therefore was unavailable to testify at trial.

When defendant took the stand in his own defense, he testified that he had joined Xavier and Laboy on the way to Maria's apartment to pick up some of Xavier's friends. According to defendant, neither he nor Xavier ever entered the apartment; instead, according to defendant, they remained outside in the car. The defendant testified that when Maria, her two children, Diaz, Laboy, and three other women packed into the car some time later, the new arrivals started "passing stuff out" and he was handed an iPhone. The defendant said he fled when police stopped the car because he believed that his fiancée might have called the police earlier that night, and he feared that police would arrest him for domestic abuse. He testified that the large amount of cash that was found on his person when he was apprehended belonged to him and that he had earned that money working on a construction job for his fiancée's father.

Although Diaz and Xavier each had averred previously in open court that defendant had committed the robberies at the time they pled nolo contendere to charges relating to the events of

identified in the photographic array by Leonardo and Melendez, nor did he take issue with the way Diaz and Xavier characterized the admissions they had previously made during their respective plea colloquies.

that night, at defendant's trial, each recanted his earlier version of events. Each claimed that he had not been paying attention to what was being said during his plea colloquy.

Indeed, in a complete reversal, Diaz took credit for robbing all four of the hapless friends, contradicting the testimony of Leonardo, Melendez, and Laboy that Miguel had not even been present at the time of the robberies. Diaz further swore that it was he who had battered the victims while Laboy and Maria helped him rifle through the victims' pockets. According to Diaz, both defendant and Xavier were outside in the car during the entire encounter. Significantly, Diaz's identification of the weapon used in the robbery oscillated between a BB gun, a .22 caliber handgun with the serial number shaved off, and "a high-power BB gun" bearing a legible serial number. Diaz claimed that he dropped the weapon in the back seat of the getaway car after the robberies and that he left the magazine inside the apartment, varying from the state's version of events that police had found the weapon's magazine in the passenger door compartment of the car.

Interestingly, Xavier also testified that it was he who bore sole responsibility for the robberies, explaining that his weapon of choice had been knives. Contradicting the version of events he had previously said was true during his own plea hearing, Xavier testified that, although defendant was in the room during the robberies, and not outside as Diaz had testified, Xavier did not recall seeing defendant holding a gun. In fact, Xavier claimed that he was "dumbfounded" when police found a BB gun in his car because, he said, he had never seen the weapon before.

Officer Donti Rosciti, of the North Providence Police Department, also testified about his

investigation of the robberies.[5]  On cross-examination by defendant, Officer Rosciti confirmed that Maria had acknowledged that she stole one of the victim's earrings.  Later, during redirect examination, the prosecutor further inquired about Maria Rojas's statement to police.  This exchange followed:

| | |
|---|---|
| "[THE STATE]: | Did [Maria Rojas] say anything about the defendant? |
| "[OFFICER ROSCITI]: | Yes. |
| "[DEFENSE COUNSEL]: | Objection -- well, not to that. Withdrawn, Your Honor. |
| "THE COURT: | All right. |
| "[OFFICER ROSCITI]: | She said he had a gun. |
| "[DEFENSE COUNSEL]: | Objection. |
| "[THE STATE]: | He put it in for ID. |
| "THE COURT: | Well, first of all, the question is did he have a knife? |
| "[THE STATE]: | No, I asked what did she say. |
| "THE COURT: | What did who say? |
| "[THE STATE]: | Maria, in the statement. |
| "THE COURT: | All right. I'll allow that. Go ahead. |
| "[OFFICER ROSCITI]: | She said Thomas Sanchez had the gun. |
| "[THE STATE]: | Did she refer to him in that statement by any other name other than Thomas Sanchez? |

---

[5]  At the time of the robberies, Officer Rosciti was a detective with the Pawtucket Police Department assigned to the Major Crimes Unit.

"[DEFENSE COUNSEL]:    Objection, same objection, Your Honor.

"[OFFICER ROSCITI]:    Bebe."

On May 27, 2016, a jury found defendant guilty of two counts of first degree robbery and one count of conspiracy to commit robbery. The trial justice sentenced defendant on the robbery counts to two concurrent thirty year terms of incarceration, with twenty years to serve and the balance suspended, with probation, and, on the conspiracy count, to ten years of imprisonment, the entirety of which was suspended, with probation. Judgment was entered on September 6, 2016, and defendant filed a notice of appeal on October 21, 2016.[6] The defendant argues before this Court that the introduction of Maria Rojas's out-of-court statement during Officer Rosciti's testimony, in view of Rojas's failure to appear as a witness at trial, violated his right to confront the witnesses against him afforded by the Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution.

## II

### Discussion

The sole issue to be determined by this Court is whether or not defendant's Sixth Amendment confrontation rights were violated. Before we reach the merits of that argument, however, we must first determine whether or not it has been preserved for our consideration.

---

[6] It is unclear whether the notice of appeal was filed by defendant's trial attorney, who is currently disbarred, or by defendant himself, as his trial counsel's signature does not appear on the document. In any case, we note that defendant's appeal was not timely filed. *See* Article I, Rule 4(b) of the Supreme Court Rules of Appellate Procedure ("In a criminal case the notice of appeal by a defendant shall be filed with the clerk of the Superior Court within twenty (20) days after the entry of the judgment or order appealed from."). We will nevertheless review this case as though defendant had filed a common law petition for writ of certiorari so that we may avoid depriving defendant of the opportunity to seek review of his criminal conviction. We therefore proceed to the merits of defendant's argument.

## A

## The Objection

We repeatedly have "made it abundantly clear that 'a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.'" *Atryzek v. State*, 197 A.3d 334, 337 (R.I. 2018) (quoting *State v. Bido*, 941 A.2d 822, 829 (R.I. 2008)); *see State v. Donato*, 592 A.2d 140, 141 (R.I. 1991); *State v. Byrnes*, 433 A.2d 658, 670-71 (R.I. 1981). Moreover, "this Court will not review issues that were not presented to the trial court 'in such a posture as to alert the trial justice to the question being raised.'" *State v. Figuereo*, 31 A.3d 1283, 1289 (R.I. 2011) (quoting *Pollard v. Acer Group*, 870 A.2d 429, 433 (R.I. 2005)). To that end, with the exception of situations where "the reason for the objection is clear from the context in which it was made[,]" *State v. Offley*, 131 A.3d 663, 670 (R.I. 2016), in the typical case "a general objection is not sufficient to preserve an issue for appellate review; rather, assignments of error must be set forth *with sufficient particularity* to call the trial justice's attention to the basis of the objection." *State v. Moten*, 64 A.3d 1232, 1238 (R.I. 2013) (emphasis in original) (quoting *Union Station Associates v. Rossi*, 862 A.2d 185, 192 (R.I. 2004)).

The defendant does not dispute that he did not explicitly state the grounds for objecting to the introduction of Maria Rojas's out-of-court statement. Instead, he argues that, because Rojas's statement was repeated by Officer Rosciti, the reasons underpinning his bald objection should have easily alerted the trial justice that he was raising a Confrontation Clause issue. To support that argument, defendant directs us to our holding in *Offley*, in which we recognized that a party's failure to explain the specific grounds for his objection may not necessarily be fatal if "the reason for the objection is clear from the context in which it was made." *Offley*, 131 A.3d at 670.

In *Offley*, the defendant argued on appeal that the admission of a witness's prior testimony was error because a proper foundation had not been laid. *Offley*, 131 A.3d at 670. However, despite the fact that he repeatedly objected to the admission of the prior testimony at trial, the defendant never once stated the basis for his objections in that proceeding. *Id.* at 668-69. Although we ultimately affirmed the conviction in *Offley*, we nevertheless concluded that the argument had been preserved because the context of the objections was sufficient to "alert the trial justice" as to the grounds for the objections. *Id.* at 670. We arrived at this conclusion after noting that the objections were made as the prosecutor was reading the prior testimony into evidence and, importantly, that the defendant was "rebuffed" by the trial justice multiple times when he attempted to explain the rationale for his objections, both at counsel table and at sidebar. *Id.*

In contrast, an examination of the transcript in the case before us at this time reveals that defendant was not "rebuffed," and that, when the trial justice attempted to clarify the nature of the question, a discussion ensued but defendant did not provide any reason for his objection. What is more, there is no indication that the trial justice understood that defendant's objection sounded in the Confrontation Clause.

Importantly, we previously have considered and rejected an argument that was strikingly similar to defendant's argument in this case. *See Moten*, 64 A.3d at 1239. In *Moten*, the defendant alleged on appeal that the introduction of a nontestifying declarant's statement violated the defendant's right to confront the witnesses against him. *Id.* at 1237-38. As is the case here, however, when the defendant in that case made his objection at trial, he failed to state the basis for the objection. *Id.* at 1239. The defendant in *Moten* sought to circumvent this infirmity by arguing that "it was clear that counsel was objecting to his inability to confront the

- 11 -

[nontestifying witness]" because of the declarant's absence at trial. *Id.* In our view, however, we deemed it "equally—if not more—plausible that the prosecutor and the trial justice understood defendant's objection to be on hearsay grounds[,]" and we thus concluded that the defendant's naked objection failed to call the trial justice's attention to the basis of the defendant's objection. *Id.* at 1239, 1240.

Just as the defendant did in *Moten*, defendant in this case objected at the moment a witness was testifying about an out-of-court statement by a nontestifying witness. *See Moten*, 64 A.3d at 1239. It was therefore "equally—if not more—plausible that the prosecutor and the trial justice understood defendant's objection to be on hearsay grounds." *Id.* As we noted in *Moten*, "[a] hearsay objection is not equivalent to an objection based on the constitutional right to confront a witness."[7] *Id.* at 1239 n.7. At the same time, we recognize that the objection was repeated and that the principles set forth in *Crawford v. Washington*, 541 U.S. 36 (2004), are no longer new law.[8] We will, therefore, assume without deciding that a Confrontation Clause objection was properly articulated.

**B**

**Harmless Error**

There is no doubt that even a properly articulated objection premised on the Sixth Amendment must be viewed through the prism of the effect the evidence may have had upon the

---

[7] An examination of the transcript leads easily to the conclusion that the objection made by defendant was intended, and understood by both the prosecutor and the trial justice, to be founded on hearsay. Although defendant has not pursued that argument before this Court, it appears to us that that objection should have been sustained on hearsay grounds. However, any error arising from the decision to admit the testimony is, for reasons set forth in this opinion, not reversible.

[8] In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court established that the introduction of testimonial hearsay against a defendant violates the Confrontation Clause unless the witness is unavailable and the defendant had previously had a meaningful opportunity to cross-examine the witness. *See Crawford*, 541 U.S. at 68.

trial. This is so because "[v]iolations of the Confrontation Clause are subject to harmless-error analysis[,]" and "[t]he inquiry is whether, assuming the defense had been afforded the opportunity to cross-examine the unavailable witness and that 'the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.'" *State v. Roscoe*, 198 A.3d 1232, 1245 (R.I. 2019) (quoting *State v. Albanese*, 970 A.2d 1215, 1222 (R.I. 2009)). The record before us reveals that the evidence placing a gun in defendant's hand during the robberies was both abundant and compelling. Three witnesses—Leonardo, Melendez, and Laboy—testified at trial that it was defendant who wielded a firearm during the robberies. Testimony at trial revealed that each victim independently identified defendant in court and from a photographic array following the incident, and each asserted that the individual whom they identified as defendant had used a firearm during the robbery. Laboy also testified that defendant had used a gun to effectuate the robberies.

In contrast, the testimony of defendant's cohorts with respect to the events of that fateful night was inconsistent to a startling degree. At trial, Diaz and Xavier testified that defendant had been uninvolved in the robberies. That story starkly conflicted with the facts that those two men admitted that they had sworn to during their own plea colloquies, however, when each had previously admitted to conspiring with defendant to commit robbery. Indeed, Xavier agreed at trial that he had claimed during his plea colloquy that defendant had used a firearm when he robbed and struck Leonardo. Moreover, Diaz and Xavier could not agree as to where defendant was during the robberies; Diaz claimed that defendant spent the encounter outside the apartment, while Xavier claimed that defendant had been present during the robberies, but that he had not participated in them. Furthermore, Diaz and Xavier each claimed sole responsibility for the

robberies—an obvious impossibility that shredded the credibility of both of them—and Diaz's description of the weapon that he claimed to have used varied among a BB gun, a .22 caliber handgun with an obliterated serial number, and "a high-power BB gun" bearing a legible serial number.

Importantly, defendant's own testimony matched neither of the stories provided by Diaz or Xavier. What is more, when defendant was apprehended after fleeing from police, he was found in possession of roughly the same amount of cash that one of the victims claimed had been stolen from his person, one of the victim's phones, and some of the victims' jewelry. Further, a BB gun and magazine were found near the seat in the getaway car that had been occupied by defendant.

It is clear to us that the state's case against the defendant neither rose nor fell with Rojas's statement that the defendant employed a weapon during the robberies. The statement attributed to Rojas by the testifying police officer is relatively unimportant in light of the testimony of the three witnesses who claimed that the defendant had used the gun, and it was wholly cumulative of the overwhelming evidence of the defendant's guilt that was presented by the state. *See State v. Doctor*, 644 A.2d 1287, 1290 (R.I. 1994) (laying out factors to consider in a harmless error analysis: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). Therefore, we can reach no conclusion other than, had the defendant "been afforded the opportunity to cross-examine" Maria Rojas, and had "the damaging potential of the cross-examination [been] fully realized," the remaining

evidence was sufficiently compelling to support the jury's finding of guilty and, therefore, the admission of Rojas's out-of-court declaration was harmless beyond a reasonable doubt. *Roscoe*, 198 A.3d at 1245 (quoting *Albanese*, 970 A.2d at 1222).

## III

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of conviction. The papers in this case are remanded to the Superior Court.

**Justice Robinson, concurring in part and dissenting in part.** I am pleased to unreservedly join the thoughtful opinion of the Court with respect to its holding relative to harmless error. However, I feel obliged to disassociate myself from that small portion of the Court's opinion which, in discussing the issue of whether or not a particular objection was sufficiently articulated at trial and thereby preserved for appellate review, engages in speculative dicta suggesting that there is even an arguable possibility that any objection on *Crawford*[1] grounds was adequately preserved. In my judgment, any such objection very definitely was *not* preserved, and I believe that it is unwise to even indirectly imply that anyone could correctly conclude that it somehow was preserved.[2]

---

[1]     *Crawford v. Washington*, 541 U.S. 36 (2004).

[2]     I refer specifically to the final paragraph of Part II.A of the Court's opinion, which reads as follows:

> "Just as the defendant did in *Moten*, defendant in this case objected at the moment a witness was testifying about an out-of-court statement by a nontestifying witness. *See Moten*, 64 A.3d at 1239. It was therefore 'equally—if not more—plausible that the prosecutor and the trial justice understood defendant's objection to be on hearsay grounds.' *Id.* As we noted in *Moten*, '[a] hearsay

Few principles in our jurisprudence are more basic or have been more emphasized than the principle that "[t]his Court staunchly adheres to the 'raise or waive' rule, * * * which requires parties to raise an issue first in the trial court before raising it on appeal." *State v. Figuereo*, 31 A.3d 1283, 1289 (R.I. 2011) (internal quotation marks omitted); *see also State v. Hak*, 963 A.2d 921, 927 (R.I. 2009) ("This Court's familiar raise or waive rule precludes us from considering issues at the appellate level that were not properly presented before the trial court."); *State v. Saluter*, 715 A.2d 1250, 1258 (R.I. 1998).[3]

An important aspect of the raise or waive rule is the requirement that "an evidentiary objection must be 'sufficiently focused so as to call the trial justice's attention to the basis for said objection * * *.'" *State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009) (quoting *State v. Warren*, 624 A.2d 841, 842 (R.I. 1993)); *see also State v. Maxie*, 187 A.3d 330, 343 (R.I. 2018)

---

objection is not equivalent to an objection based on the constitutional right to confront a witness.' * * * *Id.* at 1239 n.7. At the same time, we recognize that the objection was repeated and that the principles set forth in *Crawford v. Washington*, 541 U.S. 36 (2004), are no longer new law. * * * We will, therefore, assume without deciding that a Confrontation Clause objection was properly articulated."

[3]  In *Pollard v. Acer Group*, 870 A.2d 429 (R.I. 2005), this Court summarized the implications of the raise or waive rule and characterized it as "one of our most well-established principles * * *." *Pollard*, 870 A.2d at 432. That same opinion also noted and described "a narrow exception to the axiomatic raise or waive rule." *Id.* at 432 n.10 (internal quotation marks omitted). That "narrow exception" is not applicable to the instant case.
It is true that this Court's staunch adherence to the raise or waive rule has been the subject of thoughtful criticism. *See, e.g.*, Nicholas Nybo, *Preserving Justice: A Discussion of Rhode Island's "Raise or Waive" Doctrine*, 20 Roger Williams U. L. Rev. 375 (Summer 2015). However, while this Court certainly gives due consideration to such responsible critiques, there is no indication in the decided cases that our adherence to the raise or waive rule has become less than staunch; and I for one am not inclined to cease to adhere to that rule—at least not at this point in time.

(noting that the requirement that an objection be sufficiently focused "is grounded, in part, in our [own] rules of evidence"); *State v. Gautier*, 950 A.2d 400, 407 (R.I. 2008).[4]

As I review the above-referenced principles of law that have been so clearly and repeatedly articulated in this Court's opinions, and as I seek to apply those principles to the instant case, I am entirely unable to conclude that there is any necessity for "assum[ing] without deciding that a Confrontation Clause objection was properly articulated."  In my judgment, counsel's twice having uttered the word "objection" without further elaboration was plainly not sufficient to preserve a Confrontation Clause argument for appellate review.

I do not lightly take the time to address language in an opinion that is clearly dicta. However, it is my definite belief that the raise or waive rule and especially the requirement that "an evidentiary objection must be sufficiently focused" are such important components of our jurisprudence that I feel obliged to clearly reiterate my conviction that the evidentiary objection at issue in this case was definitely not even remotely "sufficiently focused so as to call the trial justice's attention to the basis for said objection * * *."  *Diefenderfer*, 970 A.2d at 30 (internal quotation marks omitted).  If indeed the Confrontation Clause was somehow in the back of defense counsel's mind, the plain fact is that he entirely failed to articulate it with any degree of clarity.

For these reasons, I hereby record my concurrence in part and my dissent in part.

---

[4]     In *State v. Diefenderfer*, 970 A.2d 12 (R.I. 2009), we explained as follows the rationale that underlies the raise or waive rule:

> "There is nothing Kafkaesque or arbitrary about the requirement that evidentiary objections be sufficiently focused and specific. The purpose of the requirement is to afford trial justices and opposing counsel the opportunity to grapple in the first instance with particular arguments based on the law of evidence in the vital context of the then-ongoing trial." *Diefenderfer*, 970 A.2d at 30 n.33.

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Thomas Sanchez. |
| **Case Number** | No. 2017-376-C.A.<br>(P1/14-1484C) |
| **Date Opinion Filed** | April 29, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Francis J. Darigan, Jr. |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of the Attorney General |
| | For Defendant:<br><br>J. Richard Ratcliffe, Esq. |