**Supreme Court**

No. 2013-272-C.A.
(P1/06-3227AG)

|  |  |
|---|---|
| State | : |
| v. | : |
| Barry Offley. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2013-272-C.A.
(P1/06-3227AG)
(Concurring and dissenting
opinion begins on Page 22)

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| Barry Offley. | : | |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** The defendant, Barry Offley, appeals to this Court, seeking to vacate his convictions for the execution-style murder of Jessica Imran and the serious wounding of Julie Lang. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## 1

## Facts and Travel

By July 26, 2006, Alonzo Shelton had been involved in an intermittent seven-year relationship with Brenda Alvarez. Although he listed his sister's apartment in Providence as his official residence, Shelton also lived at Brenda's[1] apartment in Central Falls with her and her three children, Natasha, Carlos, and Tatiana. Shelton developed a paternal relationship with the

---

[1] We identify Brenda and her children by their first names solely for the sake of clarity. No disrespect is intended.

children and in turn, Brenda became acquainted with several of Shelton's relatives, including his nephew, Barry Offley. According to Brenda, Offley and Shelton had a "pretty tight relationship" and Offley would often spend time with his uncle at her apartment. Indeed, Offley had, for several months, lived in the Alvarez apartment and the Alvarezes considered Offley to be part of the family as well.

During the afternoon of July 26, 2006, Brenda had a telephone conversation with Shelton while she was at work. During that conversation, Shelton complained that "he was bored" and he asked Brenda to bring Offley to the apartment so that they could play video games. Later, at about 8 p.m., while she was running job-related errands, Brenda picked Offley up and dropped him off at her apartment; she then returned to her place of employment in Lincoln. Shelton and Offley spent the evening drinking beer, watching movies, and playing video games. At about 2 a.m., Brenda's sixteen-year-old son, Carlos, joined them. At some point, the pair told Carlos that they were leaving but that they would be returning in twenty minutes. According to Offley, he and Shelton went to a "bootlegger's" to buy more beer.[2] Offley later testified that he ingested two Ecstasy pills before they left to purchase the beer.[3]

Meanwhile, intending to enjoy a night of leisure, Julie Lang dropped her three children off at their father's home. Lang planned to spend the evening with her close friend, Jessica Imran. After meeting at Imran's apartment in Pawtucket, the women dined at a Providence restaurant and eventually returned to the apartment at about 3 a.m. As they relaxed in Imran's

---

[2] A "bootlegger" is one who sells alcohol illegally after hours.

[3] Methylenedioxymethamphetamine, also known as MDMA or "Ecstasy," "is a synthetic, psychoactive drug that is chemically similar to the stimulant methamphetamine and the hallucinogen mescaline. MDMA produces feelings of increased energy, euphoria, emotional warmth, and distortions in time, perception, and tactile experiences." National Institutes of Health, National Institute on Drug Abuse, http://www.drugabuse.gov/publications/drugfacts/mdma-ecstasy (last visited Jan. 29, 2016).

apartment, someone knocked on the door. Imran, believing it to be her boyfriend, asked Lang to answer the door.

However, the person on the other side of the door was not Imran's boyfriend, but Shelton, accompanied by Offley. Although Lang and Shelton had been involved previously in a romantic relationship, a serious disagreement had caused that relationship to come to an end. The principal cause of the falling-out was an incident that had occurred several months earlier. Shelton had been a passenger in Lang's car when the Woonsocket Police pulled her over for a broken taillight. At the time of the traffic stop, Shelton was on probation and had cocaine in his possession. According to Lang, Shelton feared that, if he was arrested for possession of a controlled substance, a violation of his probation would result, and that would result in his incarceration. To prevent that from happening, he secretly slid the crack cocaine he was carrying into Lang's purse during the course of the stop. The officer, after discovering both occupants of the vehicle had outstanding warrants, placed Lang and Shelton under arrest. The police subsequently charged Lang with possession of the cocaine and with operating a vehicle while her license was suspended. Lang was incensed by what Shelton had done, and she told him in no uncertain terms that she would not admit to the drug charge to save him. She remained unmoved despite Shelton's pleas that a finding that it was he who had possessed the drugs would result in a violation of his probation and a long period of incarceration for him. That did not end the matter; Shelton continued to press her to "take the charge," but Lang remained steadfast that at her scheduled court date in early August she would maintain that the cocaine was his and that, unbeknownst to her, he had slipped the drugs into her bag during the course of the traffic stop.

And so, in the early morning hours of July 27, 2006, with Shelton still anxious about his probation being violated, he and Offley meant business when they forced their way into Jessica

Imran's Pawtucket apartment. The women demanded that the men leave the apartment. During an ensuing argument, a gunshot rang out. Lang later testified that she heard a shot and turned toward her friend. When she did, she saw Offley point a handgun at Imran. Offley fired a second time; this time, a round struck Imran in the head, killing her instantly. Offley then set his sights on Lang and fired again, but missed. When he attempted to fire another round, the gun jammed, causing live ammunition to spill onto the floor. Shelton then seized the gun from Offley and poured five shots into Lang—two of which struck her in the chest, two in the lower neck, and one behind the left ear. The assailants then fled the apartment. However, unbeknownst to Offley and Shelton, Lang survived. Bleeding heavily, but somehow managing to retain consciousness, Lang was able to dial 9-1-1.

Despite the severity of her injuries, Lang was able to identify herself by name and to provide her date of birth to a responding officer. Through labored breath, she also informed the officer that it was Shelton who had shot her, that her friend, Jessica Imran, also had been shot and that Jessica was lying upstairs. Another responding officer accompanied Lang into an arriving ambulance. When asked by that officer who else was in the apartment when the shooting occurred, she responded with the names of Jessica Imran, Alonzo Shelton, and Barry Offley.

Lang arrived at Rhode Island Hospital sometime around 5 a.m., suffering from a fractured vertebra in her neck, a damaged vertebral artery, and a collapsed left lung. The treating medical staff administered Dilaudid to her.[4] Pawtucket Police Detective Raymond Johnson arrived at the hospital shortly after 6 a.m., at which time hospital staff were still tending to Lang. After learning about Lang's critical condition, and fearing that she might not live, the detective

---

[4] Lang's treating physician at Rhode Island Hospital testified that Dilaudid is nine times more powerful than morphine.

- 4 -

asked her to provide another statement to him. Working around the medical staff, Det. Johnson began a tape-recorded interview. The Interview was interrupted several times, however, by emergency room staff tending to the intermittently conscious patient. Eventually, when asked why Shelton would want to kill her, Lang explained that it would be so that "I can't blame him for drugs. They're not mine * * * [h]e put it in my bag and I'm not taking that charge. I snitched on him in court." As the interview continued, Lang became more confused about what had happened that night; she said that it had been Offley who shot both her and Imran. When asked if she was certain if that was what transpired, she responded that she was not, and that it was Shelton who had shot both of them after he grabbed the gun from Offley. As Lang's condition continued to weaken, Det. Johnson was forced to terminate the interview.

About noon the following day, Pawtucket Police Detectives William Magill and Tina Goncalves arrived at the hospital to find Lang heavily sedated, but in stable condition. After providing the detectives with information about the acrimonious end of her past relationship with Shelton, Lang again recounted the previous night's events. This time, however, Lang said that she clearly remembered that it was Offley who had the gun and that it was he who had killed Imran. Just before she was discharged from the hospital on August 2, 2006, the detectives paid Lang one last visit to show two photo arrays to her. When shown the first array, she immediately identified Offley as Imran's killer.

In the meantime, police continued to search for Offley and Shelton. The United States Marshals eventually tracked the pair down in Florida and arrested them on September 7, 2006. On October 4, 2006, a grand jury returned a ten-count indictment against Shelton and Offley.[5] The state charged them with: (1) first-degree murder of Jessica Imran in violation of G.L. 1956

---

[5] With the exception of count 8—possession of a firearm following a previous conviction for a crime of violence—which was against Shelton only.

§§ 11-23-1 and 11-23-2; (2) conspiracy to commit the crime of murder of Jessica Imran, in violation of G.L. 1956 § 11-1-6 and § 11-23-1; (3) assault on Julie Lang with a dangerous weapon in a dwelling with the intent to murder her in violation of G.L. 1956 § 11-5-4; (4) conspiracy to murder Julie Lang in violation of §§ 11-1-6 and 11-23-1; (5) burglary of the dwelling of Jessica Imran in violation of G.L. 1956 § 11-8-1; (6) conspiracy to commit burglary in violation of §§ 11-1-6 and 11-8-1; (7) carrying a pistol without a license in violation of G.L. 1956 § 11-47-8(a); (8) possession of a firearm following a previous conviction for a crime of violence in violation of § 11-47-5; (9) discharge of a firearm during a crime of violence, resulting in the death of Jessica Imran, in violation of § 11-47-3.2(b)(3); and (10) discharge of a firearm while in the commission of a crime, resulting in the injury of Julie Lang, in violation of § 11-47-3.2(b)(2). Before trial, the state, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure, dismissed the two burglary counts. Offley went to trial before a jury on the remaining counts in Superior Court in the fall of 2007.[6]

In his opening statement, counsel argued that Offley had been nothing more than an innocent bystander to the shooting. He stressed the fact that Offley did not share any motive his uncle may have had to kill either woman. The defense sought to further mitigate any liability by telling the jury that Offley would testify to the effects that alcohol and Ecstasy may have had on his decision-making on the night of the shooting. Specifically, counsel suggested that Offley had been so intoxicated that night that he "wasn't completely with it" and could not have been an active participant to his uncle's crime.

After trial, the jury convicted Offley of the first-degree murder of Imran, conspiracy with his uncle to murder Imran, assault of Lang in a dwelling with intent to murder her, conspiracy to

---

[6] Shelton was tried separately. A further discussion of the facts in this case can be found in State v. Shelton, 990 A.2d 191 (R.I. 2010).

murder Lang, carrying a pistol without a license, discharging a firearm while committing a crime of violence that resulted in Imran's death, and discharging a firearm while committing a crime of violence resulting in Lang's injuries.

**2**

**Discussion**

On appeal to this Court, defendant raises two arguments. First, he maintains that the trial justice erred when he admitted prior testimony of a witness at Shelton's trial about defendant's level of intoxication on the night of the shooting. Second, he contends that the trial justice erred when he denied his motion for a new trial because the verdict was against the weight of the evidence.

**A**

**Prior Testimony**

In anticipation of any potential diminished capacity evidence that might be proffered by the defense, the state called Brenda's son, Carlos, to testify about the extent of defendant's drinking on the night of the murder and any effect that his ingestion of alcohol might have had on his ability to function. On direct examination, Carlos testified as follows:

> "Q Mr. Alvarez, while you were in the living room area with the defendant, Mr. Offley, and Alonzo Shelton, do you recall if you observed them drinking?
>
> "A Yes.
>
> "Q And at what point in time was this?
>
> "A Just during while we were playing video games.
>
> "Q And do you recall what this defendant, Barry Offley, was drinking?
>
> "A I believe it was Natural Ice beer.
>
> "Q Did you observe how many drinks Barry Offley had?

"A  I don't really know.

"Q  You've seen — Well, let me ask you this.  Have you seen people who have been intoxicated before?

"A  Yes.

"Q  And did Mr. Offley exhibit any signs of intoxication to you?

    "[Defense]:  Objection.

    "The Court:  Overruled.

"A  I wasn't really focusing on that.  I guess so.  He didn't seem to [sic] much, but I don't know.

    "* * *

"Q  You indicated Barry Offley was inside of the house and you were playing video games with him.  Did you notice anything about Mr. Offley?

"A  Not really.

"Q  Was he slurring his words in any way?

    "* * *

"A  I don't really recall.

"Q  And did you see him get up or walk at all when he was inside of the apartment?

"A  Don't really recall that.

    "* * *

"Q  Do you recall, Mr. Alvarez, testifying at a prior hearing back this year, June 2007?

"A  Yes.

"Q  Okay.  Do you recall being asked some questions about Alonzo Shelton and Barry Offley and whether they had been drinking?

"A  Yes.

    "* * *

- 8 -

"Q  Mr. Alvarez, do you recall being asked the question, 'You had
mentioned that Alonzo Shelton and Barry had been drinking?'
Correct?

"A  Yes.

"Q  And do you recall what your response was?

"A  No, I don't recall.

"Q  If I showed you that, would it refresh your memory?

"A  Yes.

   "[Prosecution]:  Judge, I'd ask this be marked State's 84 for
   identification, please.

            "(EXHIBIT MARKED)

"Q  I'm showing you what's been marked as State's 84.  I'm going to
direct your attention back to line 7.

"A  Yup.

"Q  You read that before, correct?

"A  Yes.

"Q  Okay.  You were asked whether or not Alonzo Shelton and Barry had
been drinking, and you responded yes?

"A  Yes.

"Q  You were asked whether or not — Do you recall being asked. 'But
you were still carrying on conversations with them, and there was
nothing to indicate their ability to play the video games, is that fair to
say?'

   "[Defense]:  Objection before he answers that question.

   "The Court:  Overruled.

   "[Defense]:  Judge, if I may.

   "The Court:  No.  Overruled.

   "[Defense]:  Same objection.

   "The Court:  Overruled.  This is prior testimony.  Overruled.  Sit
   down, please.

"[Defense]:  Can I be heard at sidebar, Judge?

"The Court:  No.  Sit down, please.  Proceed.

"Q  Do you recall responding, 'Yeah'?

"A  Yes.

"Q  You were asked the question, 'Acting normally?' Do you recall being asked that question?

"[Defense]:  Objection.

"The Court:  Overruled.

"A  Yes.

"Q  Do you recall responding, 'Yes'?

"A  Yes.

"Q  And you were then asked from the prosecutor, 'When I ask acting normally, I should ask were they acting normally?'  And your response was —

"[Defense]:  I'm going to object.

"The Court:  I'm going to overrule you again.

"Q  Your response was, 'Yes, they were acting normally.'  Do you see that?

"A  Yes.

"Q  You were asked this question, 'Not slurring their words or falling down?' And you responded, 'No,' is that correct?

"A  That's correct."

The defendant argues that this line of questioning was improper because the witness responded to the prosecutor that a review of the transcript of his earlier testimony would refresh his recollection.  Therefore, he maintains, it was both unnecessary and inappropriate to read the testimony into the record unless and until a review of Carlos's earlier testimony failed to refresh him.

However, before we analyze the substance of defendant's argument, we must determine whether defendant's objections to the line of inquiry were articulated with sufficient focus to put the trial justice on notice of their basis. We have said on numerous occasions that "a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." State v. Bido, 941 A.2d 822, 829 (R.I. 2008). Moreover, "in order to satisfy the strictures of our 'raise-or-waive' rule, an evidentiary objection must be 'sufficiently focused so as to call the trial justice's attention to the basis for said objection * * *.'" State v. Diefenderfer, 970 A.2d 12, 30 (R.I. 2009) (quoting State v. Warren, 624 A.2d 841, 842 (R.I. 1993)). The Rules of Evidence require that a specific ground for an objection must be stated unless the reason for the objection is clear from the context in which it was made. See Rule 103(a)(1) of the Rhode Island Rules of Evidence. After reviewing the record, it is our opinion that, although the colloquy between the trial justice and the defense is by no means a model of effective communication, the objections were sufficiently focused to alert the trial justice. The objections occurred as the prosecutor read the witness's prior testimony into evidence and the trial justice responded to the defense's numerous objections by stating, "This is prior testimony." Also, counsel was rebuffed both at counsel table and when he tried to approach the trial justice at sidebar so that he could explain the rationale for his objection. Although the onus does not rest on the trial justice to clarify the grounds for a party's objection, after a review of the record, we are satisfied that in the context of this exchange, the hearsay objections were adequately preserved for our review.

**i**

**Standard of Review**

This Court reviews a trial justice's admission of evidence for clear abuse of discretion.

See State v. Virola, 115 A.3d 980, 994 (R.I. 2015) (citing State v. Moreno, 996 A.2d 673, 683 (R.I. 2010)); State v. Matthews, 88 A.3d 375, 383 (R.I. 2014) (citing State v. McManus, 990 A.2d 1229, 1234 (R.I. 2010)).  To determine if a trial justice has abused his discretion, we "examine the ruling to ensure that the trial justice's discretion has been soundly and judicially exercised." Selwyn v. Ward, 879 A.2d 882, 887 (R.I. 2005) (quoting Geloso v. Kenny, 812 A.2d 814, 817 (R.I. 2002)).  However, it is well settled that we will not hold that a trial justice has "abused his or her discretion as long as some grounds supporting his or her decision appear in the record." State v. Evans, 742 A.2d 715, 719 (R.I. 1999).

**ii**

**Analysis**

The defendant argues that Carlos's prior testimony should not have been read into the record because Carlos was not provided with the opportunity to refresh his present recollection by reviewing his previous testimony, even though he indicated that such a review would refresh his memory.  It is not an infrequent occasion that a witness will indicate that he cannot recall a prior statement he made.  The purpose of present recollection refreshed or revived is that the "witness will give his or her present memory of the event as refreshed by referral to [a] memorandum."  State v. Ricci, 639 A.2d 64, 67 (R.I. 1994) (citing State v. Contreras, 105 R.I. 523, 540, 253 A.2d 612, 621-22 (1969); State v. Bradshaw, 101 R.I. 233, 221 A.2d 815 (1966)).  "In Rhode Island, when a witness' memory is exhausted, the calling party ordinarily may show the witness a writing, but may not read the writing aloud." Rule 612 of the Rhode Island Rules of Evidence Advisory Committee's Note (citing Welch & Co. v. Greene, 24 R.I. 515, 522, 54 A. 54, 57 (1902).  If, however, "the witness' memory is <u>not</u> refreshed by inspecting a writing, the

calling party may introduce the writing <u>only if</u> it is independently admissible, <u>e.g.</u> under one of

the exceptions to the hearsay rule." <u>Id.</u> (emphasis in original and added).

It is our opinion that the requirements of Rule 612 were not satisfied here because, after

his prior testimony was shown to him, Carlos was not asked whether he had an independent

recollection of defendant's behavior or whether his recollection was refreshed. When Carlos

testified that he could not recall the answers he gave at Shelton's trial, the state asked him if his

memory would be refreshed if he read a transcript of his testimony; he answered affirmatively.

Rather than make a meaningful attempt to refresh Carlos's memory, the prosecutor simply

proceeded to read his prior testimony into the record and, through the employment of leading

questions, asked him to confirm his previous answers.[7] The colloquy between the state and

---

[7] In contrast to the admitted evidence at issue in this opinion, the record reveals other instances where the state correctly refreshed Carlos's memory under Rule 612 of the Rhode Island Rules of Evidence. For example:

> "Q Do you recall what time — Well, you mentioned that you were in the living room playing video games with Barry. What time did you start playing video games, if you know, with Barry and Alonzo Shelton?

> "A I don't remember that time.

> "Q Did you give a witness statement in this case, sir?

> "A Yes.

> "Q If I showed you that, might that refresh your recollection?

> "A Yes.

> "* * *

> "Q And I'm going to direct your attention to the first page of that witness statement, in particular to the bottom couple of lines of that statement. I'm going to ask you to read that to yourself and indicate to me when you're through.

Carlos convinces us that he never had the opportunity to say his recollection was refreshed. It would only be after Carlos said that the transcript did not refresh his memory that the state could attempt to introduce his prior testimony under one of the hearsay exceptions.

However, after a thorough review of the entire record in this case we conclude that, to the extent there may have been any error by allowing the prior testimony to be read into the record, we do not believe it requires vacating the conviction because Offley's defense was predicated on accident and not on any theory of diminished capacity. Indeed, even though he alluded to defendant's state of sobriety during the course of his opening statement, counsel, on the record, specifically abandoned any reliance on a diminished capacity defense.

"Under a diminished capacity defense, a defendant submits that, <u>although he is responsible for the prohibited act</u>, 'his mental capacity may have been diminished by intoxication, trauma, or mental disease so that he did not possess the specific mental state or intent essential to the particular offense charged.'" <u>Linde v. State</u>, 78 A.3d 738, 746 (R.I. 2013) (quoting <u>Washington v. State</u>, 989 A.2d 94, 101 (R.I. 2010)) (emphasis added). The defendant, who testified in his own defense, did not concede that he shot Imran. Rather, he testified that the first shot went off accidentlly and that it missed Imran, that his uncle then seized the weapon and shot the two women, and that he had nothing to do with the shootings. Simply put, defendant could not avail himself of a diminished capacity defense because he testified and denied any responsibility for the shootings. Even though the opening statement did suggest that the use of drugs and alcohol may have impaired defendant's decision-making ability to some extent on the

---

"* * *

"Q  Does that refresh your recollection as to what time you started playing
     video games with this defendant and Alonzo Shelton?

"A  Yes."

night of the shootings, defense counsel candidly acknowledged to the court at the close of the evidence that the diminished capacity defense was no longer applicable. The record reveals this colloquy:

> "The Court: In any event, I think we are all on the same page that the diminished capacity defense is a square peg in a round hole, are we not?
>
> "[Defense]: Yes, your Honor.
>
> "The Court: This is a man who has told this jury that whatever happened in that apartment, to the extent that he had anything to do with something untoward, was a total accident. That's basically what he's saying; and he is innocent and divorced from any and all criminal activity, and that it was all Alonzo Shelton's doing. Is that not the essence of his defense?
>
> "[Defense]: Yes, your Honor.
>
> "The Court: So, to the extent he may have consumed alcohol or ingested Ecstasy, as he claims, none of it is impacted on his defense, as he has offered it.
>
> "Were I to permit the defense of diminished capacity to intrude in this case, it would be as if I were to * * * graft a self-defense instruction onto a defendant who claims that he never, ever struck anybody in the altercation, but says that, 'By the way, if I did, I did it in self-defense.' You just can't do that. So, that's pretty much where we are here.
>
> "I appreciate your candor in acknowledging this particular diminished capacity defense has no play in this case."

Further, in his closing argument to the jury, defense counsel did not argue that defendant labored under a diminished capacity on the night of the shooting, and instead focused his closing remarks on the reliability of Lang's account of what had occurred on that evening. In that defendant disavowed any responsibility for the shooting, he could not—and did not—offer a theory of diminished capacity as part of his defense. Because he was not seeking to mitigate responsibility for the crime under a theory of diminished capacity, any prior testimony that was admitted, by

any means, regarding his level of intoxication was utterly immaterial to his defense and defendant did not, in any way, suffer prejudice.

**B**

**Motion for a New Trial**

Next, defendant contends that because the verdict was against the weight of the evidence, the trial justice erred when he denied his motion for a new trial. Before we begin our analysis, we will set forth what we consider to be necessary background information.

After the state's case-in-chief concluded, defendant moved for judgment of acquittal under Rule 29 of the Superior Court Rules of Criminal Procedure. Defense counsel argued that the state's evidence was fatally flawed because it failed to establish that defendant had shot Imran or Lang, or that defendant entered into an agreement with his uncle to carry out the murders.[8] Defense counsel also argued that the evidence was insufficient to support either a verdict of first-degree murder or conspiracy in light of what defense counsel characterized as the spontaneous, rather than deliberate, conduct by defendant. After hearing from both of the parties, the trial justice denied the motion for judgment of acquittal.

The defense then put on its case; its sole witness was defendant himself. The defendant admitted his close relationship with Shelton, as well as his awareness that Shelton "got in trouble" with Lang during the traffic stop. The defendant also testified that he was aware of his uncle's fear of being sent back to jail and of Lang's unwillingness to relieve him of that fear by pleading to the drug charges herself. Despite all this animosity, defendant maintained that they did not barge into Imran's apartment that night. To the contrary, he said that they had been

---

[8] The defendant did not challenge the sufficiency of the evidence regarding count 7, carrying a pistol without a license.

invited there. The defendant told the jury that instead of going to the bootlegger's, the pair met Imran and Lang in the parking lot of a nearby gas station, where he and Imran drank alcohol while Shelton and Lang spoke out of earshot.[9] Although he claimed to be "zoning" and "in a whole other world," defendant said that he could recall being invited by the women to Imran's Pawtucket apartment. Before going there, however, defendant and his uncle made a brief stop at the Alvarez apartment, where Shelton ran back into the house while defendant waited outside.

The defendant said that when they finally arrived at Imran's apartment, but before they got out of the car, out of nowhere, his uncle asked him to carry a gun. According to defendant, Shelton was afraid that the weapon might be stolen if it was left in the car but he was unwilling to carry the gun himself, because Lang feared guns and she would "feel it on him" when she hugged him. He said that he first declined his uncle's request, but ultimately relented, sticking the gun down the front of his pants before following Shelton upstairs. In addressing the effects the drugs and alcohol had on him that night, defendant testified that when the pills "kicked in," he was "feeling real good," but was nonetheless still aware of what was going on around him and could still recall what happened after he and his uncle were inside the apartment.

While "still feeling the same way [he] was feeling earlier" from the drugs, defendant testified, he decided to play a joke on Lang by pulling out the gun and walking up behind her. Although Lang initially was frightened by the weapon, defendant told the jury that he relieved her anxiety by informing her that he only had it on him because he was trying to sell it. He said he was surprised when Imran expressed an interest in purchasing it; the $500 or $600 price tag piqued Imran's interest and she wanted to know more, including whether or not the gun was loaded. The defendant told the jury that he pulled the slide back to reveal "a whole bunch of

---

[9] The state's medical examiner testified that no alcohol was discovered in Imran's system.

bullets" in the chamber.  When he shook the gun to dislodge one of them the gun went off accidentlly, firing a round into the wall.  He testified that the next thing he knew, his uncle grabbed the gun out of his hands and shot Imran and Lang in quick succession.  When asked how he felt in the aftermath of the shooting, defendant responded that he was "[n]ot completely sober, but I was sober."

The defendant told the jury that his shock dissipated when his uncle demanded that they leave.  When Shelton told him, "I love you, but I can't leave you," defendant said, he realized that his uncle would shoot him if he did not comply.  The defendant testified that, having presumed that both women were dead, the pair fled to a nearby crackhouse.  Although he said he could not recall anything about the location, defendant did recall that soon after arriving, a "crackhead," known only to Shelton, drove them to New York City, where the two men hopped on a bus to Florida.  In explaining his six weeks at large, defendant explained that he loved his uncle and did not want to get him in trouble.  He also told the jurors that Shelton had convinced him that they were equally culpable of any crimes that had been committed and that he feared that his uncle would kill him if he tried to leave or report Shelton's whereabouts to the police.  The defendant also admitted that even though he was innocent of any crime, he nonetheless chose to give police a false name after he was arrested.

**i**

**Standard of Review**

"When ruling on a motion for a new trial, the trial justice acts as a thirteenth juror, exercising 'independent judgment on the credibility of witnesses and on the weight of the evidence.'"  State v. Heredia, 10 A.3d 443, 446 (R.I. 2010) (quoting State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007)).  "Specifically, 'the trial justice must (1) consider the evidence in light of

the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" Id. (quoting State v. Texieira, 944 A.2d 132, 140 (R.I. 2008)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." Id. (citing State v. Snow, 670 A.2d 239, 244 (R.I. 1996)). "This Court accords great deference to a trial justice's ruling on a motion for a new trial 'if he or she has set forth sufficient reasoning in support of the ruling.'" State v. Abdullah, 967 A.2d 469, 479 (R.I. 2009) (quoting Imbruglia, 913 A.2d at 1028). We "will not overturn a trial justice's ruling on a motion for a new trial unless he was 'clearly wrong' or 'overlooked or misconceived material and relevant evidence that related to a critical issue in the case.'" State v. St. Michel, 37 A.3d 95, 102 (R.I. 2012) (quoting State v. Cerda, 957 A.2d 382, 386 (R.I. 2008)).

Even though a trial justice's decision to grant or deny a motion for a new trial need not be exhaustive, the trial justice "should reflect a few sentences of the justice's reasoning on each point." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (quoting State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994)); see also State v. Silva, 84 A.3d 411, 417 (R.I. 2014). The trial justice "need not refer to all the evidence supporting [his or her] decision," but need only "cite evidence sufficient to allow this [C]ourt to discern whether the [trial] justice has applied the appropriate standards." State v. Robat, 49 A.3d 58, 71 (R.I. 2012) (quoting State v. Guerra, 12 A.3d 759, 766 (R.I. 2011)).

**Analysis**

The trial justice began his analysis of the motion by noting that the case ultimately pitted Lang's credibility against that of the defendant. And, after hearing defendant's testimony, he asserted that he could "in no way fault" the jury for believing Lang's testimony about what happened on July 27, 2006. Indeed, the trial justice found that defendant's own testimony was "wholly unworthy of belief" and served the very purpose of convicting him. In passing on the credibility of defendant's testimony, the trial justice cited this Court's decision in State v. Mattatall, 603 A.2d 1098 (R.I. 1992), in which we said

> "when a defendant elects to testify, he runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth. * * * As long as there exists some other evidence of the defendant's guilt, disbelief of [a] defendant's sworn testimony is sufficient to sustain a finding of guilt. * * * 'A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn.'" Id. at 1109 (quoting United States v. Cisneros, 448 F.2d 298, 305 (9th Cir. 1970)).

Here, the trial justice clearly did not accept defendant's version of events, ruling that "no rational factfinder would or could accept" defendant's explanation that the gun's discharging while it was in defendant's hands was an accident. The trial justice also found there was ample evidence for the jury to find that defendant and his uncle plotted the murder in advance. The defendant admitted on cross-examination that he had a close relationship with his uncle and that he knew his uncle was facing a return to prison because of the drug incident. In light of the facts that Imran was shot in the head and Lang was shot five times and left to die, the trial justice found this effort to execute two people was motivated by "the oldest motive of all"—leaving no witnesses. In rejecting defendant's claim that, to the extent he participated in the crime, he did

so at the behest of a domineering uncle, the trial justice cited this Court's observation that "[i]t runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes." State v. Hernandez, 641 A.2d 62, 72 (R.I. 1994) (quoting United States v. Batista-Polanco, 927 F.2d 14, 18 (1st Cir. 1991)).

The trial justice acknowledged the inconsistencies in Lang's early accounts of the assault, but described her as being "steadfast" in her later accounts and her testimony of what had occurred that night: after missing Imran with his first shot, Offley dispatched her with a second shot. Shelton then took the gun from defendant after it jammed before he turned it on her. Even in the face of inconsistencies among Lang's statements, the trial justice also found that defendant's actions after the shooting and during his arrest were strong indications of guilt. The defendant's flight to Florida, where he hid for six weeks with the uncle he supposedly feared, and the use of a false name when he was finally arrested provided further proof of his guilt. The trial justice described defendant's testimony as not only "ludicrous," but "perjurious," concluding that "the evidence resoundingly compels the verdict as announced by this jury."

In our opinion, the trial justice properly assessed the weight of the evidence and the credibility of the witnesses, and he "articulated adequate reasons for denying the motion." State v. Fleck, 81 A.3d 1129, 1134 (R.I. 2014) (quoting State v. Phannavong, 21 A.3d 321, 325 (R.I. 2011)). We discern no errors in the denial of the motion for a new trial.

**Conclusion**

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record is remanded to that tribunal.

**Justice Goldberg, dissenting in part and concurring in part.** I concur in the majority's opinion with respect to the denial of the defendant's motion for a new trial, and I also concur in the judgment of the Court affirming the conviction in the face of the defendant's challenge to the trial justice's admission of Carlos's prior testimony. However, I cannot agree with my colleagues that "the requirements of Rule 612 [of the Rhode Island Rules of Evidence] were not satisfied" and that, therefore, the prior testimony should not have been read into the record. In my opinion, the requirements of Rule 612 are irrelevant in this case because Carlos's prior testimony was properly admitted as a prior inconsistent statement made by a previously cooperative witness. Therefore, I would affirm the trial justice's decision allowing this testimony into evidence at trial.

Under Rule 801(d)(1)(A) of the Rhode Island Rules of Evidence, "[a] statement is not hearsay if: * * * The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony[.]" In this trial, at a point in the state's case when defendant's diminished-capacity defense very much was in play,[1] Carlos testified that, in the hours leading up to the murder, defendant and Shelton were drinking in Brenda's apartment. When asked how many drinks defendant consumed that evening, the witness responded, "I really don't know." (Emphasis added.) The witness was also asked whether defendant exhibited any signs of intoxication, and Carlos answered, "I wasn't really focusing on that. I guess so. He didn't seem to [sic] much, but I don't know." (Emphases added.) Additionally, Carlos could not recall whether or not defendant was slurring his words. When asked whether he saw defendant get up or walk at all when he was

---

[1] It was not until an in-chambers conference after the close of all evidence that defense counsel abandoned the diminished-capacity defense.

inside the apartment, the witness responded, "Don't really recall that," despite admitting moments earlier—after his recollection was refreshed by his police statement—that he observed defendant make a sandwich and watch a movie with his sister that evening. This testimony does not reflect a failure of memory as the majority concludes.

This occasion—in November 2007—was not the first time the witness testified about what transpired in the apartment shortly before the murder. Approximately seven months earlier, in early May 2007,[2] Carlos testified at Shelton's trial, before the same trial justice who presided over defendant's trial. During that appearance, Carlos testified that, although defendant and Shelton were drinking in the early morning hours of July 27, 2006, they were "acting normally"; they were not slurring their words or falling down and were capable of conversing with Carlos while they played video games. At defendant's trial in November 2007, the prosecutor confronted Carlos with this prior testimony after he testified that he did not know about or was not focusing on these same facts and professed an inability to recall a number of important details about defendant's consumption of alcohol shortly before the murder. In my opinion, this was proper impeachment evidence and not a Rule 612 exercise intended to refresh the witness's recollection.

In State v. Matthews, 88 A.3d 375 (R.I. 2014), this Court explained the circumstances in which prior testimony might be admissible under Rule 801(d)(1)(A) to impeach a witness who was experiencing a "convenient failure of memory" on the witness stand:

> "Where a witness no longer remembers an event, a prior statement describing that event should not be considered inconsistent. Yet the tendency of unwilling or untruthful witnesses to seek refuge in a claim of forgetfulness is well recognized. Hence the judge may be warranted in concluding under the circumstances the claimed

---

[2] Although the prosecutor in defendant's trial referred to Carlos's prior testimony as occurring in June 2007, it appears that the prosecutor was mistaken about the date.

> lack of memory of the event is untrue and in effect an implied denial of the prior statement, thus qualifying it as inconsistent. The case law readily accepts this position." Matthews, 88 A.3d at 384 (quoting 2 McCormick on Evidence, § 251 at 214 (7th ed. 2013).

On several occasions, this Court has affirmed a trial justice's admission of prior statements of a witness in these circumstances. See, e.g., id. (affirming introduction of witness's police statement under Rule 801(d)(1)(A) where witness "professed a lack of memory regarding almost all of the facts salient to the robbery and his subsequent arrest"); State v. McManus, 990 A.2d 1229, 1234-36, 1236 (R.I. 2010) (affirming introduction of witness's police statement even though it was improperly admitted by the trial justice as a recorded recollection because the statement could have been admitted as a prior inconsistent statement under Rule 801(d)(1)(A) where witness "purported to suffer from jail-house amnesia, a frequent malaise"); State v. Jaiman, 850 A.2d 984, 986, 986-88, 990 (R.I. 2004) (affirming introduction of witness's police statement under Rule 801(d)(1)(A) where witness "suffered a convenient failure of memory, declaring over and over again, especially at critical points about details of this drive-by shooting, that he had difficulty remembering"). As this Court explained in Matthews, 88 A.3d at 384, once the prior statement of the witness is admitted, the question of whether the witness's inability to recall is in fact untrue and an implied denial of the prior statement is ultimately a question for the jury in assessing the witness's credibility. See also McManus, 990 A.2d at 1236 (explaining that the purpose of Rule 801(d)(1)(A) is "to allow for [prior inconsistent] statements * * * to be introduced as substantive evidence in order for the fact finder to decide which statement [i.e., the prior inconsistent statement or the in-court testimony], if any, is worthy of belief"). Importantly, this testimony is admitted as substantive proof at trial.

I am of the opinion that the circumstances of this case are analogous to—although not as extreme as—those in Matthews, McManus, and Jaiman and served as the basis for the impeachment evidence. I reach this conclusion notwithstanding the prosecutor's question to Carlos whether reading a transcript of the prior testimony would "refresh [his] memory." It is apparent from the record that the prior testimony was being used not to refresh Carlos's recollection, as was done immediately beforehand with the witness's police statement, but to impeach his inconsistent testimony under Rule 801(d)(1)(A). The record supports this conclusion. Shortly before Carlos's prior testimony was admitted, it was quite clear that the prosecutor was well versed in the proper procedure for refreshing a witness's recollection and did so in a textbook-perfect manner.[3] Nonetheless, the witness continued to be vague and

---

[3] The following exchange is illustrative:

"Q Do you recall what time — Well, you mentioned that you were in the living room playing video games with [defendant]. What time did you start playing video games, if you know, with [defendant] and Alonzo Shelton?

"A I don't remember that time.

"Q Did you give a witness statement in this case, sir?

"A Yes.

"Q If I showed you that, might that refresh your recollection?

"A Yes.

"[Prosecutor]: Judge, I'd ask this be marked as State's 83 as an identification exhibit.

"(EXHIBIT MARKED)

"Q Mr. Alvarez, do you recognize that?

"A Yes.

- 25 -

elusive after reading his police statement. The prosecutor then asked whether Carlos saw Shelton and defendant leave the apartment on that fateful early morning. When Carlos answered, "I don't remember," the trial justice ordered a recess and stated, "Have the witness review his statement." Shortly after the recess, Carlos's inability to recall important details resumed once again, this time in response to questions bearing on defendant's diminished-capacity defense.

At this point, after Carlos stated, "I really don't know," "I wasn't really focusing on that," "I don't know," and "I don't really recall" with respect to the salient facts about defendant's level of intoxication, the prosecutor confronted him with his prior testimony. It is clear from the

---

"Q What do you recognize that to be?

"A My witness statement.

"Q And I'm going to direct your attention to the first page of that witness statement, in particular to the bottom couple of lines of that statement. I'm going to ask you to read that to yourself and indicate to me when you're through.

"A Which lines?

"Q I'm going to direct your attention to [the] sixth, seventh, and eighth lines down. Read those to yourself and tell me when you're through.

"(PAUSE)

"A Okay.

"Q Does that refresh your recollection as to what time you started playing video games with this defendant and Alonzo Shelton?

"A Yes.

"Q Okay. Approximately what time was it that you started playing video games with Alonzo Shelton and [defendant]?

"A Two o'clock."

record that this inquiry did not follow the steps that the prosecutor took when previously refreshing Carlos's recollection with his police statement. The prior testimony was used to impeach the witness with a prior inconsistent statement. Moreover, this seasoned trial justice, who was a front-and-center observer of Carlos's testimony in May 2007 and his performance in November 2007, clearly understood that this was impeachment of the witness's testimony with a prior inconsistent statement. In response to defendant's objection to the prosecutor's use of the prior testimony, the trial justice tersely responded, "Overruled. This is prior testimony. Overruled." In my opinion, it is apparent from the record that the trial justice permitted the prosecutor to impeach Carlos with his prior inconsistent statement and that the prosecutor was no longer attempting to refresh the recollection of this recalcitrant witness. The prosecutor's repeated demonstration of her ability to refresh Carlos's recollection in textbook fashion a mere ten transcript pages before the crucial exchange, when coupled with the trial justice's comment that "[t]his is prior testimony," makes me unable to join the majority's analysis of whether "the requirements of Rule 612" were satisfied and the majority's conclusion that they were not. I am of the opinion that Rule 612 is simply not implicated in this case and this evidence was properly admitted under Rule 801(d)(1)(A).

I pause to note, however, that the trial justice's refusal to grant defense counsel's request to be heard on the objection or at a sidebar conference is unfortunate. Defense counsel's request should have been granted. The efficacy of appellate review is strengthened by a developed record, and, in this case, had the parties and the trial justice discussed the use of the prior testimony on the record, this Court's resolution of the issue would have been more straightforward. Nonetheless, I remain convinced from my review of the record that the trial justice appropriately allowed the prosecutor to impeach the suspiciously-forgetful Carlos with

his prior testimony and to admit that testimony under Rule 801(d)(1)(A). I cannot agree that this evidence was erroneously admitted, notwithstanding the majority's conclusion that the error was harmless. In my opinion, a harmless-error analysis of this testimony is unnecessary in the context of this case. Consequently, I respectfully dissent in part and concur in part.



**TITLE OF CASE:**          State v. Barry Offley.

**CASE NO:**          No. 2013-272-C.A.
                    (P1/06-3227AG)

**COURT:**          Supreme Court

**DATE OPINION FILED:**   February 4, 2016

**JUSTICES:**          Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**          Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

          Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

          For State:  Jane M. McSoley
                    Department of Attorney General

          For Defendant:  George J. West, Esq.