July 25, 2024

**Supreme Court**

No. 2023-124-C.A.

(W1/20-168A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Louis Seignious. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Louis Seignious. | : |

Present: Suttell, C.J., Goldberg, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** After a jury trial, the defendant, Louis Seignious (defendant or Seignious), was convicted of first-degree murder, carrying a firearm during the commission of a crime of violence, and domestic breaking and entering, which occurred in Westerly, Rhode Island. On appeal, Seignious challenges the trial justice's denial of his motion for a new trial, as well as the trial justice's determination to allow into evidence certain testimony concerning fingerprints without qualifying the witness as an expert. After careful consideration, we affirm the judgment of conviction.

- 1 -

# I

## Facts and Travel

In 2017, Seignious and Dionne Johnson (Johnson) began a romantic relationship. Although the courtship soon ended, the relationship produced a daughter and the couple remained amicable for the benefit of the child. Johnson made clear at trial that after their breakup, however, defendant did not have an open invitation to visit unannounced at her home.

In December 2019, Johnson began a romantic relationship with the decedent, Vincent Sebastian (Sebastian). The defendant and Sebastian were cousins and their once close relationship had recently cooled and become hostile. In one instance—after Seignious and Johnson ended their relationship—Seignious instructed Johnson to "stay away from Mr. Sebastian." Johnson was understandably concerned that Seignious might discover her new relationship and stated at trial, "I just wouldn't let him know. I didn't want him to know." Johnson's prognostication brings us to the following relevant events.

On Friday, January 24, 2020, Seignious and Johnson exchanged text messages concerning a child-support payment and visitation arrangements for the coming weekend. With no resolution reached on that date, the conversation continued into the morning of January 25, 2020, when Johnson texted and then called Seignious to finalize arrangements. The defendant responded to the call by informing Johnson

that he had just awakened and would return the call "when he gets situated." Seignious next contacted Johnson by text message at 12:34 p.m., stating: "I'm a lil under the weather you got some NyQuil for me." Johnson explained that "NyQuil" was an innuendo used by Seignious when "he was asking me for sex." Johnson showed the "NyQuil" text to Sebastian, who advised her not to respond. Johnson did not respond.

At approximately 1 p.m., Johnson, three of her children, and Sebastian attended a birthday party that Johnson's friend, Jessica Smyth (Smyth), was hosting for her young son. According to Johnson, during the party Sebastian was angrily texting the mother of his son, Genesha Wallace (Wallace), and proceeded to capture two photographs—one with his arm around Johnson. Although the precise timeline of events is unclear, Sebastian texted the pictures to Wallace, who then forwarded one or both pictures to Seignious. Realizing that the relationship Johnson sought to keep quiet was now public, she and Sebastian became embroiled in a verbal confrontation and were directed by a guest to a nearby bathroom. Once in the bathroom, Sebastian instructed Johnson to "call him right now." Johnson complied; she initiated a video call (at Sebastian's direction) and handed the phone to

Sebastian. The defendant was able to observe firsthand Sebastian and Johnson together. The video call began at 1:48 p.m. and lasted twenty-eight seconds.[1]

Johnson recounted that Seignious and Sebastian were "just on the phone exchanging words and yelling at each other back and forth." Johnson also recalled defendant stating that he was going "to drive up to, to the spot," a comment that "scared" and "petrified" Johnson. Sebastian and Johnson promptly left the party.

Johnson borrowed Smyth's car and Sebastian directed her to drive and pick up two individuals, Jason Hedges (Hedges) and Abraham Julue (Julue). Johnson drove to her home, where the passengers disembarked. She returned to the party to retrieve her three children and Smyth. After additional errands, Johnson returned home with her children and Smyth drove her vehicle back to the party.

Johnson lived in a duplex on Marriott Avenue in Westerly. Because Johnson did not own a vehicle—and instead often obtained transportation from Smyth or borrowed Smyth's vehicle—the designated parking area outside her residence often was vacant. Johnson recalled that during her relationship with defendant, Seignious parked his vehicle in the designated area in the front of her home. Johnson also testified that she never remembered an occasion in which the designated parking

---

[1] Although the evidence indicates the length of the video call, the encounter itself was not recorded.

- 4 -

area was full, causing someone to use the parking lot assigned to a commercial business behind her house.

Johnson further explained that to enter her home, one would pull open a screen door and then push open the front door and enter the living room. According to Johnson, the screen door would "squeak" when opened, a telltale sign that someone was entering the house. A couch was located on the far wall of the living room to the right of the door and a loveseat was situated to the right of the couch. The loveseat separated the living room area from the kitchen area. To the left of the front door was a stairwell, which led to the second floor. The stairway was situated in such a manner that the front door could not be opened more than approximately ninety degrees and when opened, the door blocked entry to the stairwell, and, significantly, would prevent someone on the stairwell from accessing the first floor.

Sebastian and his companions, Hedges and Julue, settled in on the living room couch and loveseat, listening to music, drinking alcohol, and smoking marijuana. Johnson was standing in the living room when she received a telephone call from Nafeezah Shabazz (Shabazz), Sebastian's aunt. Johnson handed the phone to Sebastian and after a one- or two-minute conversation, Sebastian returned the phone to Johnson. Thereafter, Sebastian proceeded upstairs while Johnson continued speaking to Shabazz as she headed into the kitchen.

Johnson testified that her attention was diverted to the front door when she heard the familiar "squeak" noise. When Johnson turned, Seignious was standing inside her house. According to Johnson, upon entering the home, Seignious exclaimed, "Where's Vinny?" Johnson also recounted that from her vantage point, she watched Seignious's left hand enter his pocket whereupon "[h]e transferred a gun from his left hand to his right hand." While Johnson was unfamiliar with firearms, she described the object as "[s]ome small, like, silver, has some, like, twisty thing on it * * *."

Hedges and Julue remained in the living room, apparently unconcerned with the unscheduled and unknown visitor, as Sebastian descended the stairs. According to Johnson, "when he got down the stairs, I, I was just like, oh, my God, and then you just hear a bang * * *." Johnson further testified that "Mr. Seignious and Mr. Sebastian w[ere] pushing the door back and forth, and back and forth. But Mr. Sebastian had pushed this one last push, and, um, Mr. Seignious had fell back. That's when, um, um, Mr. Sebastian had locked the door, and then he ran up the stairs." Immediately after defendant was ejected from the house, Johnson went upstairs and discovered Sebastian wounded and lying motionless on her child's bedroom floor. He was later pronounced dead from a single gunshot wound to the chest. The entire episode—from entry into the home to Seignious being ejected from the home—transpired in a matter of seconds.

- 6 -

The state presented additional witnesses, who largely corroborated Johnson's testimony. Shabazz testified that during the shooting, she was on a video call with Johnson. Shabazz described Johnson's tone suddenly changing when Johnson repeatedly started screaming: "He shot up my house[]" and "He shot up my house with my kids in there." Shabazz queried, "Who shot your house up?"; Johnson replied, "Louis shot [my] house up."

Julue testified that his attention was drawn to the front door when someone entered the house and shouted, "where's that * * * Vinny."[2] Julue did not know the person who entered the house but testified that he was not alarmed by the unexpected entry and that he continued texting. Julue also related that Hedges was sitting nearby on the loveseat and "just looked at me and continued to do what he was doing." Julue further testified that he heard footsteps, followed by a gunshot "directly across from where I was sitting. So where the stairwell is, where the banister is and the front door." Although Julue indicated that he never saw a gun, he nonetheless explained that upon hearing the sound of a gun and perceiving a "flash" emanating from the front door area, he and Hedges jumped up and ran into the kitchen.[3]

---

[2] The record contains slight variations on the precise verbiage heard by Julue, but any distinction is immaterial for our purposes. The omitted language contains a racial epithet.

[3] Despite his presence in the living room at the time of the shooting, Hedges, who the record suggests may have been related to Sebastian, avoided any cooperation with law enforcement and rejected repeated attempts to provide a statement to law

At the time of trial, Johnson's neighbor, T.P., was fourteen years old.[4] T.P. was familiar with Seignious and related that, on January 25, 2020, she was playing a video game and heard Johnson's screen door open. Upon hearing the screen door open, T.P. peered out her bedroom window and saw "Louis put his hand like around the door a little bit. And then that's when I heard the big boom. And then Vinny was still fighting him out the door, and he pushed him out the door. And Louis fell on his butt, and he got up and ran."

In addition to the eyewitness testimony, various security videos captured an individual, before the shooting, backing a vehicle into a parking space in the commercial parking lot behind Johnson's house. Security videos also captured this same person walking up the dirt path connecting the commercial parking lot and Johnson's home, and later running to the vehicle parked in the commercial lot. Johnson later identified the person in the surveillance videos as defendant.

Shortly after the homicide, Officer Peter Beckwith (Officer Beckwith) testified, he received a BOLO—be on the lookout—for a four-door silver Kia sedan or SUV, which was related to a shooting. The bulletin also advised that Seignious was a suspect in the shooting. Officer Beckwith soon received additional

---

enforcement. An attempt was also made by the state to serve a trial subpoena upon Hedges, which he refused to sign. Hedges did not appear at trial.

[4] Because T.P. was a minor at the time of trial, we reference this witness through initials only. We intend no disrespect.

information that Seignious was in the area and obtained a photograph of him. Shortly thereafter, Officer Beckwith observed Seignious driving past his position and he activated his emergency overhead lights and siren to engage pursuit. Seignious refused to stop and instead initiated a high-speed chase. Eventually, defendant eluded Officer Beckwith and abandoned the vehicle, which was later transported to the Westerly Police Department (WPD) for further investigation.

Several days later, on February 1, 2020, Detective Sergeant Travis Winkelman (Detective Winkelman) of the City of Groton Police Department in Connecticut received a tip from an employee of the Branford Manor housing unit. According to Det. Winkelman, the caller reported observing a person they believed was Seignious. After conducting an apartment-by-apartment search, Det. Winkelman discovered a hole in the ceiling of one of the apartments, which "looked like something had come through, maybe the size of a leg * * *." While police continued searching, defendant fell through the ceiling, landing in the bedroom. He was taken into custody without further incident.

A subsequent search of defendant's clothing revealed a letter signed by him, addressed to his wife, and dated January 30, 2020. The letter was admitted into evidence and stated, in pertinent part:

> "I know you have heard much about me in Rhode [I]sland.
> Dont believe anything I am accussed [*sic*] of. I have more
> reguard [*sic*] for life! Im just try[ing] to get some money
> up to get a * * * great lawyer and have my day in court to

clear my name. All I know is God is good because those 3 men were trying to kill me, and im [*sic*] sad to say I think [Johnson] tried to set me up to be ambushed. I dont know why she would do that to me. * * * She knew [Sebastian] was out for blood[.] So I dont know why he would be there when Im [*sic*] supposed to be picking up my daughter never mind him hiden [*sic*] behind the door, lastly he had two other nefarious men with him. They all simultaneously tried to attack me. I *never* been so afraid in my life. Im [*sic*] just glad I made it off that street with my life."

Detective Sergeant David Turano (Detective Turano) of the WPD testified concerning his role in the investigation. Detective Turano acknowledged that he was unable to recover a shell casing from the crime scene and that he did not process the front door area for fingerprints. On cross-examination, Det. Turano reiterated that if a revolver was used during the shooting, he would not expect to recover a shell casing; and he defended the decision not to dust for fingerprints because "[w]e had known who was inside the residence at the time." Detective Turano also testified concerning the collection of gun-shot residue from the steering wheel of the vehicle abandoned by Seignious after the high-speed chase. Detective Turano related that he divided the steering wheel into quadrants and used four tabs to collect residue from each quadrant. A later test determined the presence of particles "commonly associated with primer-gunshot residue" located in one quadrant and the presence of one particle "consistent with primer-gunshot residue" located in another quadrant.

The indictment in this case charged Seignious with first-degree murder, in violation of G.L. 1956 § 11-23-1; committing a crime of violence, *viz.*, murder, while in possession of a firearm, in violation of G.L. 1956 § 11-47-3; and domestic breaking and entering without consent, in violation of G.L. 1956 §§ 11-8-2 and 12-29-5. He was found guilty by a jury on all counts. The defendant filed a motion for a new trial, which the trial justice denied in a bench decision on November 21, 2022. The trial justice sentenced Seignious to life in prison on the first-degree murder conviction and an additional ten years to serve consecutively for the commission of a crime of violence while in possession of a firearm conviction. Seignious also received a concurrent ten-year sentence for the domestic breaking and entering conviction, which was suspended. This appeal ensued.[5]

Additional relevant facts will be set forth below as necessary.

## II

### Analysis

On appeal, Seignious raises two issues. First, Seignious contends that the trial justice erred when she denied his motion for a new trial; and second, that the trial justice erred when she overruled defense counsel's objections and allowed Det.

---

[5] Because the judgment of conviction entered on March 8, 2023, defendant's December 15, 2022 notice of appeal was premature. "[I]t is well settled that a premature notice of appeal will be considered timely so long as final judgment is entered thereafter." *State v. Vose*, 287 A.3d 997, 1002 n.7 (R.I. 2023) (quoting *State v. Lamontagne*, 231 A.3d 1132, 1138 n.2 (R.I. 2020)).

Turano to answer three fingerprint-related questions without having been qualified as an expert witness. We discern no error.

**A**

**Motion for a New Trial**

Seignious argues that the trial justice overlooked material evidence, and as such, improperly denied the motion for a new trial. Specifically, defendant submits that no witness observed him discharging a firearm and the initial statements provided to the WPD failed to indicate that any witness observed defendant in possession of a firearm. The defendant also focuses on the lack of physical evidence implicating him in the shooting, the autopsy report concluding that the shooting occurred at a distance greater than two feet, and an uncooperative witness (Hedges), who Seignious contends actually fired the fatal shot from across the room. Seignious further argues that on the basis of various inconsistent statements, the motion for a new trial should have been granted; namely whether defendant possessed a firearm upon entering Johnson's home, whether defendant spoke upon entering Johnson's home, and defendant's precise physical location at the time of the shooting.

"When passing on a motion for new trial, 'the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.'" *State v. Cerda*, 957 A.2d 382, 385 (R.I. 2008) (quoting *State v. Bergevine*, 942 A.2d 974, 981 (R.I. 2008)). In so doing, "the trial justice

- 12 -

must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Paola*, 59 A.3d 99, 104 (R.I. 2013) (brackets omitted) (quoting *State v. Vargas*, 21 A.3d 347, 354 (R.I. 2011)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Cerda*, 957 A.2d at 385 (quoting *State v. Schloesser*, 940 A.2d 637, 639 (R.I. 2007)).

On review, "a trial justice's ruling on a motion for new trial is entitled to great weight provided that he [or she] has 'articulated an adequate rationale for denying a motion.'" *Cerda*, 957 A.2d at 385-86 (quoting *Bergevine*, 942 A.2d at 981). "A trial justice's ruling on a new-trial motion will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *Id.* at 386 (quoting *State v. Lynch*, 854 A.2d 1022, 1046 (R.I. 2004)). Having carefully reviewed the record, we are satisfied that the trial justice independently evaluated the evidence, properly assessed the credibility of the witnesses, and did not overlook relevant or material evidence.

- 13 -

The trial justice focused her review on the state's eyewitnesses and concluded that these witnesses "testified credibly * * * with absolutely no motive to lie or create falsehoods, that * * * Mr. Seignious shot and killed Mr. Sebastian." In so doing, the trial justice described a "compelling feature" of Johnson's testimony as the moment she was alerted to someone unexpectedly entering her home. As soon as Johnson turned around, the trial justice recalled, Johnson "saw the [d]efendant inside the door where the tile meets the rug." According to the trial justice, defendant immediately stated, "Where's Vinny[?]"; thus indicating defendant sought to locate Sebastian. The trial justice further noted that Johnson's testimony was corroborated by Julue and that

> "this is evidence that Mr. Seignious, having knowledge or suspecting that [Sebastian] was in the house, clearly had him in mind as a target immediately. He burst into the house, 'Where's Vinny?' * * * He came in. He was armed. Miss Johnson saw him remove a gun from his left pocket and hand it over to -- transfer it, rather, to his right hand. She heard a bang."

Because Johnson had a prior romantic relationship (and a child) with defendant, the trial justice further properly observed that she was able to positively identify him.

The trial justice further examined Julue's testimony, which described hearing footsteps moments before the gun fired and observing a flash of light emanating from the front door area. Additionally, the trial justice noted T.P.'s testimony concerning the front door "making the same characteristic noise that Miss Johnson

had testified to."  As related by the trial justice, T.P. had known defendant for two years and identified him as the person at Johnson's front door who was fighting with Sebastian when she heard the gunshot.

With respect to the domestic breaking and entering charge, the trial justice appropriately observed that the evidence demonstrated that "there was no open-door policy at the premises for Mr. Seignious to appear at the home and enter without the occupant's consent.  That there would always be arrangements in place if he was to come over for any reason that pertained to his daughter * * *."  Finally, the trial justice observed that defendant fled the scene, initiated a high-speed chase, and concealed himself in the attic of an apartment unit.[6]

---

[6] The trial justice provided the jury with a flight instruction, stating in relevant part:

> "Flight and concealment, in and of themselves, do not create a presumption of guilt solely because the Defendant fled or is alleged to have fled and concealed himself.  A flight may be motivated by factors entirely consistent with innocence.  On the other hand, you may consider flight or concealment as a factor, when determining if the State met its burden of proof. * * * [T]herefore, you may consider evidence of flight and concealment against the Defendant, if you find that the following facts have been proven, beyond a reasonable doubt.  One, that a person fled the scene of the crime; two, that the person who fled was the Defendant; and, three, that the Defendant fled and concealed himself in order to -- in order to avoid observation and/or arrest."

On appeal, defendant does not challenge this instruction.

- 15 -

After reviewing the material testimony and evidence, the trial justice concluded:

> "So there's plenty of evidence to support the breaking and entering, as well as the murder in the first degree -- overwhelming evidence that shows motive -- even though the State need not prove motive -- overwhelming evidence that Mr. Seignious went there looking for Mr. Sebastian, armed with a gun, and, immediately upon seeing Mr. Sebastian descend the stairs within the unit, he shot and killed him.

> "There is not a specter of reasonable doubt, anywhere, as to any element of any crime of which Mr. Seignious was convicted. The Jury made the absolute right decision on all counts, and the [c]ourt concurs in, in their decision to find Mr. Seignious guilty on all counts; and, therefore, * * * the motion for a new trial * * * is denied * * *."

Here, the record amply demonstrates that the trial justice properly employed the motion for a new trial analysis, detailed grounds for denying the motion, and articulated clear and strong credibility findings. *See State v. Karngar*, 29 A.3d 1232, 1235 (R.I. 2011) ("If the trial justice agrees with the jury's verdict or determines that reasonable minds could disagree about the outcome, then he or she must deny the new-trial motion * * *."). Contrary to defendant's argument, the trial justice also considered and rejected defendant's contention that Johnson provided inconsistent statements, such as observing that Johnson, "at first," failed to "describe the gun as a gun * * *." *See, e.g.*, *State v. Lopez*, 129 A.3d 77, 85 (R.I. 2016) (noting that testimonial inconsistencies do not necessarily discredit all of the witness's

- 16 -

testimony).  She found the witness credible.  Because the trial justice agreed with the jury's verdict and did not overlook or misconceive any material evidence, we discern no error in her decision.

**B**

**Testimony Concerning Fingerprints**

Seignious argues that the trial justice improperly permitted Det. Turano to offer expert testimony and speculate in response to what defendant contends are three questions regarding the transfer, aging, and science of fingerprint analysis.[7] The defendant maintains that the improper testimony "added undue weight to the detective's unqualified testimony" and "prejudiced the defense's theory that the

---

[7] The defendant's written arguments fail to direct this Court to any specific challenged question, except: "If you were here last week, could a fingerprint have been left behind?"  However, no objection was interjected to that question, and therefore, we have no occasion to consider its propriety. *See, e.g.*, *State v. Barros*, 148 A.3d 168, 172 (R.I. 2016) ("As we have said on innumerable occasions, 'a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.'") (quoting *State v. Bido*, 941 A.2d 822, 829 (R.I. 2008)).  Although defendant does not specifically identify any other questions/objections at issue in this appeal—but rather generally discusses the trial justice's decision to allow Det. Turano to provide what defendant contends was expert opinion testimony—we nonetheless conclude that defendant's brief provides sufficient context that the three questions/objections discussed herein are at issue. To the extent defendant challenges other questions/objections, we are unable to discern such an argument, and therefore, waiver controls. *See, e.g.*, *Stebbins v. Wells*, 818 A.2d 711, 720 (R.I. 2003) (stating that a party's failure "to brief a particular issue on appeal results in a waiver of that issue").  The state claims that defendant waived this issue in its entirety because defense counsel's objections failed to provide the trial justice notice that he was alleging that a lay witness was offering opinion testimony.  We decline to decide this issue on the basis of waiver.

investigating officers had hastily and improperly processed the crime scene due to their overly limited focus on [defendant] * * *." We set forth below the relevant testimony in detail, which provides proper context for our analysis.

During the state's case-in-chief, Det. Turano testified on direct examination without objection concerning his investigation of the crime scene on the evening of the shooting:

> "Q:    When I watch TV, they take fingerprints of everything; did you take -- look for fingerprints anywhere?
>
> "A:    No, I did not.
>
> "Q:    Any reason why?
>
> "A:    Uh, doors are not the best surfaces because multiple people touch them.  They're touched all the time for fingerprints and DNA.  You have very little success of getting enough material to be able to do a comparison. With the rain, that also takes that away."

On cross-examination, defense counsel theorized that Det. Turano's decision to forgo exploring fingerprints compromised its investigation and inappropriately focused the investigation onto Seignious:

> "Q:    You didn't make any attempt to secure fingerprints from the inner door or the doorknob of the residence -- of that, of the inside door, did you?
>
> "A:    No.
>
> "Q:    Wouldn't it have been helpful, to the investigation, if fingerprints could be lifted from any of those surfaces?

"A: I don't see how. We had known who was inside the residence at the time. That was the information I was given.

"Q: I understand, but your job is to collect the evidence from different sources that could include shell casings, fingerprints, objects or things that are in the vicinity that may be relevant to the investigation; it encompasses a lot of different tasks, does it not?

"A: Yes, it does.

"Q: But you made a decision not to try to lift fingerprints from either of those surfaces, either the outside door, the inside door, the doorknobs, correct?

"A: Correct."

On redirect, Det. Turano provided further testimony concerning the reasons for his decision not to search for fingerprint evidence:

"Q: Fingerprints. My fingerprint's there (indicating), isn't it?

"A: It's a possibility.

"Q: Now it's there (indicating)?

"A: It's a possibility.

"Q: Why isn't it there, why is it just a possibility?

"A: Because if the oils or moisture do not transfer, if you slide when you touch, if your hand is dirty, and there's many factors into a fingerprint.

"* * *

- 19 -

"Q: I just handed my pen to the detective. My fingerprint may have been on that pen, correct?

"A: Correct.

"Q: Now it's in his hand, what could have happened to that fingerprint?

"[DEFENSE COUNSEL]: Objection, it's *speculation*.

"THE COURT: Okay. If, if you know, with your training, Sergeant, you may answer.

"A: The fingerprint could have been compromised.

"Q: By the time you got to that location, what was the weather?

"A: It was raining.

"Q: How do -- how does rain and fingerprints go together?

"A: It adds more water to it. It makes it more difficult to obtain a fingerprint. It could also degrade or destroy the fingerprint.

"Q: You were in this courtroom yesterday --

"A: Yes.

"* * *

"Q: From yesterday to today, could you have left a fingerprint behind?

"A: Could I --

- 20 -

"[DEFENSE COUNSEL]:      Objection. Again, *speculation*.

"THE COURT:   If you can answer to a reasonable degree of scientific certainty, based on your training and experience, Sergeant, you may answer.[8]

"A:   Yes, I could have left a fingerprint.

"Q:   If you were here last week, could a fingerprint have been left behind?

"A:   Yes.

"Q:   So, if someone had been to that house before and touched it, that fingerprint could be left behind.

"[DEFENSE COUNSEL]:      Objection.

"THE COURT:   Overruled.

"A:   Yes, it could be." (Emphases added.)

Although there was no objection raised that the witness was offering expert opinion, this Court has observed that "the decision to permit opinion testimony by a lay witness is within the sound discretion of the trial court. Review of the trial

_____

[8] In his brief, defendant references the trial justice's instruction and suggests the language utilized further demonstrated that Det. Turano was treated as an expert witness. To the extent defendant assigns error to the trial justice's instruction that Det. Turano could answer if he was able to do so "to a reasonable degree of scientific certainty, based on your training and experience," we conclude that this issue is waived. Although defense counsel interjected an objection to the question posed to Det. Turano, as speculation, no objection was raised after the trial justice overruled that objection and provided her instruction. Therefore, we have no occasion to address this issue. *See, e.g.*, *Barros*, 148 A.3d at 172.

court's decision is limited to determining whether the trial court abused its discretion." *State v. Doyle*, 235 A.3d 482, 499 (R.I. 2020) (brackets omitted) (quoting *In re Emilee K.*, 153 A.3d 487, 494 (R.I. 2017)). We conclude that the trial justice did not abuse her discretion.

Detective Turano testified concerning his extensive investigative experience, which included the successful completion of the Municipal Police Academy and, after becoming a detective, successfully completing further training at the crime scene school investigation course at the University of Rhode Island. Detective Turano also participated in several in-service training programs and was an assistant instructor at the crime lab. Detective Turano's law-enforcement career spanned twenty-five years.

Seignious appears to contest three fingerprint-related questions/objections, the substance of which elicited testimony that a person who touches an object may leave a fingerprint and that an existing fingerprint may become compromised if another person touches the existing fingerprint. Before this Court, defendant characterizes such evidence as "technical testimony regarding the science of fingerprint analysis"; we disagree and conclude that the challenged testimony was not outside the common knowledge of an average juror and did not rise to the level of expert opinion evidence. *See* R.I. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."); *see also Navarro v. State*, 264 S.W.3d 530, 543 (Ark. 2007) (concluding no abuse of discretion in allowing lay testimony elicited from investigator that it was not unusual to find the absence of blood or fingerprints on objects that have been touched); *Mack v. State*, 223 A.3d 1191, 1204, 1205 (Md. Ct. Spec. App. 2020) (holding no abuse of discretion when lay police officer opined that "surfaces that are coarse or rubberized or uneven typically do not yield latent fingerprints").

Here, there was "nothing scientifically novel or complex" about Det. Turano's testimony that a person who touches an object or an existing fingerprint may leave a fingerprint or compromise an existing fingerprint, respectively. *See Doyle*, 235 A.3d at 501. Nor has defendant pointed to a single question that would require an expert opinion. In this respect, it is significant that the challenged testimony was procured in the context of Det. Turano explaining his own investigatory decision to forgo searching for fingerprints at the crime scene, which was called into question during cross-examination. Contrary to defendant's position, there is nothing improper about a law-enforcement officer explaining his or her professional conclusion not to collect or investigate certain potential evidence and providing opinion testimony rationally based on their perceptions. *See* R.I. R. Evid. 701;[9] *see*

---

[9] Rule 701 of the Rhode Island Rules of Evidence provides:

*also Doyle*, 235 A.3d at 500 ("We are of the opinion that Det. Elliott testified about her own firsthand observations and did not offer expert opinion testimony because there was no need for her to do so."); *State v. Mallett*, 600 A.2d 273, 276 (R.I. 1991) ("Lieutenant Rossiter's medical training, coupled with his observations about the victim's condition and the blood's still being wet, provides more than enough facts to conclude that his testimony [concerning the time of death] was rationally based upon his perceptions.").

At bottom, the defendant claims that his defense was dependent on the theory that officers conducted a lackluster investigation and he asserts that it was critical that "the jury had to weigh whether or not the detective's decision not to collect fingerprint evidence was well-founded or spurious." This evidence and defense counsel's related arguments were presented to the jury, which proceeded to reject the defense theory and convicted the defendant of all crimes charged in the indictment.

---

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

## III

## Conclusion

For the reasons stated herein, the judgment of conviction is affirmed. The record shall be remanded to the Superior Court.


Justice Robinson did not participate.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Louis Seignious. |
| **Case Number** | No. 2023-124-C.A.<br>(W1/20-168A) |
| **Date Opinion Filed** | July 25, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Melanie Wilk Thunberg |
| **Attorney(s) on Appeal** | For State:<br><br>Devon Flanagan Hogan<br>Department of Attorney General |
| | For Defendant:<br><br>Angela M. Yingling<br>Rhode Island Public Defender |